KLESTADT WINTERS JURELLER                    **Hearing Date:  April 28, 2017**
SOUTHARD & STEVENS, LLP                      **Hearing Time: 10:00 a.m.**
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000
Tracy L. Klestadt
TKlestadt@Klestadt.com

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
wkelleher@cohenlaw.com
Helen S. Ward, Esq. (*pro hac vice pending*)
hward@cohenlaw.com

*Attorneys for tronc, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
In re:                                          Chapter 11

METRO NEWSPAPER ADVERTISING                     Case No. 17-22445 (RDD)
SERVICES, INC.,

        Debtor.

-----------------------------------------------------------X

**RESPONSE IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN**
**ORDER (i) DETERMINING TRONC, INC. TO BE IN WILLFUL VIOLATION OF THE**
**AUTOMATIC STAY AND (ii) DIRECTING TRONC, INC. TO PAY THE DEBTOR'S**
**COSTS AND FEES INCURRED AND COMPENSATORY DAMAGES SUSTAINED IN**
**CONNECTION WITH THIS MOTION PURSUANT TO THIS COURT'S CIVIL**
**CONTEMPT POWERS AND 11 U.S.C. §§ 105(a) and 362(a) AND REQUEST FOR**
**<u>HEARING ON SHORTENED NOTICE</u>**

TO:    **THE HONORABLE ROBERT D. DRAIN**
       **UNITED STATES BANKRUPTCY JUDGE**

tronc, Inc. ("tronc"), by and through its counsel, hereby responds and objects to Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice (the "Motion"), without consenting to jurisdiction or waiving its jurisdictional objections, as follows:

## FACTUAL BACKGROUND

1.    tronc is a newspaper print and online media publishing company with its principal place of business in Chicago, Illinois.  Originally a division of the Tribune Publishing Company, tronc spun off into a separate entity in 2014, at which point it adopted the name "tronc" (which is short for Tribune online content).  tronc's publications include the Chicago Tribune, Los Angeles Times, San Diego Union Times, Orlando Sentinel, Baltimore Sun, and others.

2.    tronc deals with many agencies that order ads in tronc's publications on behalf of advertisers. Metro served as the advertising agency for numerous advertisers, including the approximately 19 advertisers[1] (the "Clients") whose accounts are at issue in this matter.  The Clients utilized Metro's services as an advertising agency to place advertisements in tronc's newsprint and online publications.

---

[1] While Metro was in fact the agent for other advertisers who placed certain orders with tronc, the advertisers with the largest, outstanding obligation to tronc are as follows: AARP, AB Data Limited, ADT, Blue Shield of CA, Boehringer (LAT), Burger King Corporation, Capital One (CTC), Centene Corp dba Health Net, Dignity Health, Eau Palm Beach Spa, HSBC Bank, Incyte Pharmaceuticals, LG Electronics, Mutual of Omaha, Navy Federal Credit Union, Pentagon Federal, PNC Bank, Sands Bethlehem, and Siemens.

3.      The Clients' procurement of advertising space in tronc's news publications often took place by the Clients contacting tronc through Metro for ad placement.  Metro would often forward to tronc an "Insert Order," on behalf of the Client which specified (1) the advertisement tronc was to publish or insert, (2) the Client's identity, (3) any specific instructions for publication, (4) the commissions due any agencies for agent services ordered (including Metro's), and (5) the total due tronc for the advertisement.  A representative Insert Order is attached as **Exhibit A** to the Declaration of Richard Hausmann in Support of tronc's Response filed contemporaneously herewith ("Hausmann Declaration").  The Insert Order would reflect the commissions to Metro or the other agencies payable by the Client (not tronc).

4.      Frequently, subsequent Change Orders would include changes or other specific information and expressly state and request that tronc "please change the advertising of [Client]." A representative Change Order is attached to the Hausmann Declaration as **Exhibit B**.

5.      Historically, tronc would then place the advertisement in the publication that the Client had selected.  After the advertisement ran, tronc would send Metro an invoice specifying the net amount due and owing to tronc from the Client.  A representative Invoice is attached hereto at **Exhibit C** to the Hausmann Declaration.  The invoices listed a "Net Amount" that reflected the total amount due to tronc, which Metro was to pay or turn over to tronc.  See Exh. C.

6.      On or around March 28, 2017, tronc received notice of Metro's bankruptcy filing and the financial difficulties Metro was facing.  Shortly thereafter, and on numerous occasions, tronc was informed by Metro and other agencies that, due to the bankruptcy filing, many of the advertisers that used Metro for advertising agency services—including many of the Clients— were leaving Metro for other advertising agencies.

7.      On April 6, 2017, tronc was informed by a Metro representative that it was closing its doors.   Thereafter, in a good faith effort to collect the millions of dollars in uncollected balances owed to it by the Clients, tronc mailed out letters to the Clients for the advertisements that tronc published on the Clients' behalf (the "Letters").   The Letters, dated April 6 and 7, 2017, inter alia, state that the respective Client owes a balance to tronc for services tronc rendered to and for the benefit of the Client.   The Letters acknowledge Metro's bankruptcy filing but made it clear that tronc was not attempting to collect any debt owed to Metro.   A representative Letter is attached to the Hausmann Declaration as **Exhibit D**.

8.      The Letters do not reference or request the collection of any amounts other than those due directly to tronc for its publications.   See Exh. D.   The invoices provided with the Letters exclude any commissions due or owing to Metro or any other agency.   See Exh. D.

9.      Even though tronc did not issue invoices directly to the Clients prior to the Letters, tronc always maintained that the advertisers and Metro were jointly and severally liable to pay for the publications which is consistent with tronc's Standard Terms and Conditions, as published on tronc's website, which state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."   See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** **E** to the Hausmann Declaration.

10.      Upon receiving word of the Letters' distribution, counsel for Metro threatened tronc's counsel and demanded that tronc cease and desist tronc's lawful collection activities and asserted that tronc is in violation of the automatic stay.   tronc's counsel responded and explained to Metro's counsel, inter alia, that tronc sought only to collect funds owed directly to tronc by the Clients for tronc's services.   See April 12, 2017 correspondence, attached to the Motion as

Exhibit B.  Metro's counsel offered no explanation for his theory that the stay extended to non-debtor parties, but instead filed the Motion on April 18, 2017.

## PROCEDURAL ISSUES

**A.**     ***No Grounds Exist for Metro's Filing of its Motion on an Emergency Basis.***

11.     As an initial matter, Metro inappropriately and unnecessarily filed its Motion on an emergency basis, depriving tronc of a fair opportunity to prepare to address Metro's fabricated allegations.[2]

12.     tronc's lawful actions have not and will not interfere with Metro's ability to collect any amounts due and owing to Metro from any Client.  No immediate harm is imminent to justify the denial of tronc's rights to sufficient notice and due process.  As is obvious from the face of the Letters, tronc seeks only to recover what is owed directly to tronc from parties who are not in bankruptcy (or before the court).  Metro is not currently operating.  Despite Metro's assertions, it is chronologically impossible that tronc's Letters to the Clients was the catalyst for Metro's inevitable demise.  tronc did not send the Letters to the Clients until after Metro's representative informed tronc that Metro was closing its doors.  See Hausmann Declaration, ¶ 13-14.  tronc's actions pose no threat of harm (immediate or otherwise) to Metro or its interests.  If the non-debtor Clients pay tronc directly, they may have a right of recoupment or offset, but that is a function of the agency relationships, not a violation of the stay.  See also 11 U.S.C. §553(a).  Metro can not use the automatic stay as a basis for being unjustly enriched by the advertising services furnished by tronc.  Accordingly, this Court should dismiss the Motion or, alternatively, reschedule the hearing until an appropriate time that allows for tronc's collection of all factual information and evidence relevant to the fabricated allegations in the Motion.

---

[2] To the extent necessary, tronc generally denies Metro's allegations in the Motion.

### B.    *Metro's Motion Should Have Been Brought as an Adversary Proceeding.*

13.    Metro's Motion also must be denied because it should have been brought as an adversary proceeding. Instead, Metro improperly raised its claims through the Motion as a contested matter.

14.    The significance of whether a dispute is to be resolved through an adversary proceeding or as a contested matter is rooted in the procedural rules applicable to each. An adversary proceeding is governed by Part VII of the Federal Rules of Bankruptcy Procedure and is initiated by the filing of a complaint and service of a summons. See Fed. R. Bankr. P. 7001. Conversely, a contested matter is initially governed by Rule 9014 and is commenced by the service of a motion. See Fed. R. Bankr. P. 9014.

15.    Rule 7001 of the Federal Rules of Bankruptcy Procedure dictates when an adversary proceeding is required. Rule 7001 states that, inter alia, proceedings to recover money or property or to obtain an injunction or other equitable relief are adversary proceedings. Fed. R. Bankr. P. 7001.

16.    When a party seeks injunctive relief or damages for a violation of the automatic stay, that party must assert its claims through the process of an adversary proceeding. See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005) (dismissing contested matter proceeding without prejudice because debtor's request for injunctive relief and punitive damages was the type of action that requires commencement of an adversary proceeding); In re McDonald, 265 B.R. 3, 10 (Bankr. D.Mass.2001) (stating that the broad language of Rule 7001(1) permits debtors to bring litigation to recover money for a violation of the automatic stay as an adversary proceeding, and even if the court was in error on this point, the court would be within its discretion under Rule 9014 to order that all the adversary rules in Part VII of the

6

bankruptcy rules would apply in this matter); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997) (holding that since proceedings seeking to remedy a claimed violation of the automatic stay almost always pursue money, property or injunctive relief, such matters are required to be brought as adversary proceedings); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994) (finding that action to collect punitive damages for violation of automatic stay should be brought by way of an adversary proceeding).[3]

17.    Metro's Motion seeks, inter alia, injunctive relief, compensatory damages, punitive damages, and attorneys' fees.  The primary relief sought in the Motion is a "cease and desist" injunction.  Claims for these types of relief are expressly identified in Rule 7001 as adversary proceedings, governed by the procedures set forth in Part VII of the Bankruptcy Rules of Civil Procedure.  Therefore, Metro should have raised this matter by filing a complaint with the Court and serving tronc properly with a summons.  The failure to do so must result in the dismissal of the contested matter. See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005); In re McDonald, 265 B.R. 3 (Bankr. D.Mass.2001); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994).

18.    Even if this Court holds that Metro was correct to request injunctive relief, damages, and attorney's fees through its Motion, Metro failed to properly serve the Motion under Rule 9014.  Rule 9014(b) states that "[t]he motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule

---

[3] tronc notes for this Court that case law does exist in which a court permitted a debtor to address purported violations of the automatic stay through the procedural process of a contested matter.  See, e.g., In re Hooker Investment, Inc., 116 B.R. 375, 378 (S.D.N.Y. Bankr. 1990).  Such case law is distinguishable as the immediate motion clearly and primarily seeks injunctive relief, and not simply damages related to purported automatic stay violations.  See id. (which allowed the debtor to bring as a contested matter a claim for relief in the form of a declaration of a stay violation and that such actions were void and expressly acknowledging that the debtor therein was not seeking any injunctive relief but rather, only an automatic stay violation and related damages).  Metro's submission of the allegations in its Motion is nothing but a thinly-veiled attempt to circumvent any perceived inconvenience (or lack of perceived leverage over tronc) Metro would face if it were to bring an adversary proceeding.

9006(d)." Fed. R. Bankr. P. 9014. Metro failed to properly serve its Motion in the manner

required by Rule 9014. Instead of serving tronc in the manner prescribed by the Rules, Metro

improperly mailed a copy of the motion and notices of hearing to tronc's attorney. tronc had not

filed a proof of claim or entered any other appearance in the case, and Metro (or its counsel)

never even asked tronc's counsel if she was authorized to accept service. See Affidavits of

Service, Doc. Nos. 25 and 27. Accordingly, Metro's Motion should be dismissed.[4]

## **LEGAL ARGUMENT**

### *A.*    *Metro's Relationships With the Clients Were Those of Agent and Principal.*

19.    Metro's relationships with the Clients were that of agent and principal. As such,

the principal Clients are independently liable to tronc for the amounts owed and Metro's Motion

must be denied as the disclosed principal and also for unjust enrichment.

20.    As an initial matter, Metro's Motion assumes that New York state law on agency

applies to the issues at hand. This is not necessarily true. First, tronc's Standard Terms and

Conditions state that "all matters arising out of or relating to this Agreement, [are] governed by,

and construed in accordance with the substantive law (excluding choice of law provisions) of the

state of the relevant publication. See Advertising Agreement Standard Terms and Conditions for

Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** **E** to the Hausmann

Declaration.

21.    In the case that this Court finds the choice of law provision to be inapplicable, the

Court must apply New York choice-of law provisions. See In re Enron Corp., 367 B.R. 384, 392

(Bankr. Ct. S.D.N.Y. 2007) ("The Court looks to choice-of law rules of New York to resolve any

---

[4] Metro also failed to comply with the minimum notice requirements for its purported service of the Motion, failed to obtain a scheduling order shortening notice, and failed to file an affidavit under Local Rule 9077 attesting to the emergency grounds supporting shortening notice. tronc reserves all rights with respect to these procedural defalcations, but notes that it will be present in Court at the noticed return date and time of the Motion with witnesses present and available to testify should the Court decide to conduct an evidentiary hearing at that time.

conflict-of law questions.")  New York utilizes a "significant contacts" analysis in determining the appropriate state law to apply.  In re Worldcom, Inc., 361 B.R. 697 (Bankr. Ct. S.D.N.Y. 2007) ("New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.") (internal quotations omitted).

22.     In the matter at hand, there are numerous states that have contacts with the facts at issue.  The respective Clients are located in cities throughout the country and the advertisements were published in no less than seven states.  None of the ads at issue were published in New York.  The largest amount of Client advertisements for which tronc has not received payment were placed in Illinois and California.  tronc is headquartered in Illinois and incorporated in Delaware.  Upon information and belief, Metro is a New York corporation with a principal place of business in New York.[5]  Because Metro failed to appropriately analyze and set forth the proper choice-of-law considerations and instead assumes that New York state law applies, tronc

---

[5] As stated in the Declaration of Phyllis Cavaliere Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtor's Chapter 11 Petition, however, the Debtor also maintained offices in, inter alia, Chicago and San Francisco before those offices were closed as part of the Debtor's "cost cutting" measures. See Doc. No. 2, ¶11.

responds to Metro's arguments under New York state law, but reserves the right to object to the application of New York law to this analysis.[6]

23.     Generally, in New York, the existence of an agency relationship is determined in light of the facts and circumstances of each case. Matter of Dean L Burdick Associates, Inc., 19 B.R. 813, 813-14 (Bankr. S.D.N.Y. 1982).   An agency relationship may be established "by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act … The agent is a party who acts on behalf of the principal with the latter's express, implied or apparent authority." Time Warner City Cable v. Adelphi University, 27 A.D.3d 551, 552 (N.Y. App. Div. 2006) (internal quotation omitted). The relationships between Metro and the Clients fit squarely into the category of agent and principal and, thus, under New York law, primary liability falls to the Clients for the amounts owed to tronc.

24.     Metro's Motion misstates New York law on agency in relation to advertising agencies and advertisers for print media.  Contrary to Metro's assertions, this Court has held that relationships like those between Metro and the Clients are those of agent and principal.   In Matter of Dean L Burdick Associates, Inc., this Court, by the Honorable Edward J. Ryan, found an agency relationship between advertising agency and advertiser. 19 B.R. at 814-15.   In Burdick, this Court explains that print media is a separate industry from television and radio,

---

[6] If the Court determines California or Illinois law applies to this proceeding, this Court should likewise find that an agency relationship exists and deny Metro's Motion.  See In re Hall & Levine Advertising, Inc., 894 F.2d 1344 (C.D. Cal. 1990) (finding that an advertising agency was an agent of the advertiser, citing the agreement between the agency and advertiser and the agency's disclosure of the advertiser as its principal); Store of Happiness v. Carmona & Allen, Inc., 152 Cal.App.2d 266 (Cal. Dist. Ct. App. 1957) (holding that the evidence proved existence of agency relationship, citing provisions of the contract between the advertising agency and the advertiser as well as the fact that the agency sold no goods or other tangibles to sell, nor did it own television time other than that procured for the advertiser.); U.S.C.C. Mgmt. Co. v. Ogden Allied Sec. Servs., Inc., No. 90 C 1389, 1991 WL 274445, at *3 (N.D. Ill. Dec. 13, 1991) (holding that whether an agency relationship exists is a mixed question of fact and law that depends upon the practices of the parties, including the "matter of hiring, direction of servants, the right to terminate the relationship, and the character of supervision of the work done.")

with its own "customs and usages," and states that a publication media is entitled to assume that an advertising agency is seeking space on behalf of a principal. Id. at 815.  In coming to its determination, the Court relies upon Clarke v. Watt, a New York state court case.  The Court in Clarke v. Watt finds that an advertiser, having received full benefit of the advertising, could not escape payment and deprive the newspaper from fees. 145 N.Y.S. 145 (N.Y. App. Term 1913).

25.    Debtor asserts that there is no agency relationship between it and the Clients, arguing that New York law supports this proposition without addressing the contrary New York authority in the print media industry or even acknowledging or addressing the basic tenant under New York law that "[w]here the identity of the principal is disclosed, there is a presumption that credit is extended only to the principal and not to the agent" and that "[p]ayment alone does not explain…credit arrangements."  New York Times v. Glynn-Palmer Associates, Inc., 138 Misc.2d 862, 865 (N.Y. Civ. Ct. 1988); see also American Diabetes Ass'n v. Abbey, Mecca & Co., Inc., 77 A.D.3d 1333-34 (N.Y. App. Div. 2010) (finding that advertising agency acted as agent for clients even where insertion orders placed did not disclose client name on orders where publisher was aware of the client and the insertion orders contained no language suggesting that an agency relationship did not exist).

26.    It is clear from the facts and circumstances in the matter at hand that an agency relationship did exist between Metro and the Clients.  For each advertisement, Metro forwarded to tronc an Insert Order identifying the respective Client as well as the specifics of the advertisement to be placed.  Following publication, tronc issued invoices setting forth the net amount owed by the Client to tronc.  Moreover, industry norms and customs require that an agency relationship be assumed, unless the facts show otherwise.  Metro has set forth no

11

evidence that the parties involved intended to contract around the agency dynamic. To the contrary, Metro clearly was acting in its capacity as an agent for its principals, the Clients.

27.    The ultimate liability for the amounts outstanding to tronc for its services rests squarely with each respective Client and tronc's actions in pursing the debts were proper and lawful.

28.    The case law cited by Metro does not contradict the findings in the above cases or support the argument that Metro was not acting as the Clients' agent. Of the three cases cited, Metro relies most heavily on <u>CBS, Inc. v. Stokely-Van Camp, Inc.</u> to support Metro's argument that Metro was not acting as an agent for the Clients. However, as discussed above, in analyzing a factual scenario in print media, as opposed to television and radio, this Court in <u>Burdick</u> distinguishes <u>CBS</u> and finds an agency relationship between the advertising agency and the advertising client. See <u>Burdick</u>, 19 B.R. at 814-15.

29.    Moreover, in <u>Fairchild Publications Division of Capital Cities Media, Inc. v. Rosston, Kremer & Slawter, Inc.</u>, 584 N.Y.S.2d 389 (N.Y. Sup. Ct. 1992) the Court states that it is actually undisputed that an agency relationship existed between an advertising agency and advertiser, but that the media company successfully proved that the advertiser should be nonetheless held liable for debts owed by showing that: (1) the advertising agency agreed to be liable for the debts of the advertising company and (2) custom and usage rendered the advertising agency liable.    The facts in this instance will show that both the advertisers and Metro are liable for outstanding obligations due and owing to tronc. Here, the relationship between the parties as well as the custom and usage[7] establish that both Metro as agent and the

---

[7] As the court in <u>Burdick</u> specifically finds, in the print media publishing industry, custom and usage indicate an agency relationship. See <u>Burdick</u>, 19 B.R. at 814-15.

Client as principal were co-obligors on the tronc obligations and certainly never contemplated or established that the liability to tronc was solely Metro's.

30.    Likewise, in <u>Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island</u>, 59 Misc.2d 268 (N.Y. Dist. Ct. 1969) the Court assumes that a de facto agency relationship exists, but finds that the particular circumstances of that case result in financial liability of the agent instead of the principal.  Ultimately, the court finds that the terms in the insert orders sent by the advertising agency to the media company constituted contractual agreements, which specifically excluded recovery by the media entity from the advertising party.  <u>Id.</u> at 270-71.  The Insert Orders that Metro forwarded to tronc include no provision excluding recovery or collection from the Clients and, thus, the analysis in <u>Huntington</u> is inapplicable to the issues at hand.

### B.    *Metro's Motion Misconstrues the Automatic Stay Protections*

31.    Beyond Metro's incorrect characterization of the facts and New York agency law, Metro also grossly misconstrues the application of the automatic stay under Section 362(a)(3) of the Bankruptcy Code when it argues for the purported voidabilty of any payments made to tronc by the Clients that received and benefitted from the services provided by tronc, and that are directly and independently liable to tronc for such services.[8]

32.    If this Court were to follow Metro's logic and reasoning, the practical effect would be that the bankruptcy of an agent relieves the principal of liability to a third party.  No aspect of bankruptcy permits or sanctions that result.  Indeed, the Bankruptcy Code says precisely the opposite.  Section 524(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity on, or the property of any other entity for, such debt.**"  11 U.S.C. § 524(e) (emphasis added).

---

[8] tronc's standard terms and conditions, as published on tronc's website, are consistent with tronc's position in this Response and state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."  http://www.tribpub.com/ad-io-terms/  <u>See</u> Exh. E.

33.     Nothing in section 362 changes the general rule enunciated in section 524(e), nor does it prohibit a party from enforcing its rights against a non-debtor, even if that non-debtor is a co-obligor with a debtor.

34.     As is obvious from the face of the Letters, tronc is in no way pursuing any assets or property of Metro or its estate.  tronc is not seeking to collect any receivable due and owing to Metro or any other party.  Rather, tronc is seeking to collect debts from non-debtors who are directly liable for, and received the benefit of, the services provided by tronc.  The invoices enclosed with the Letters clearly demonstrate that tronc is only collecting from the Clients the value of the advertising services provided by tronc.  Metro did not provide any of those published advertising services.

35.     Even though Metro and the Clients are jointly liable to tronc for the amounts owed, the automatic stay applies to proceedings against a debtor and does not apply to any other entity.   The automatic stay does not apply to nonbankrupt co-defendants or co-obligors and is not intended to give an unwarranted immunity from suit to solvent co-debtors, which itself would "contravene the purposes underlying the automatic stay."  See, e.g. CAE Industries Ltd. v. Aerospace Holdings, Co., 116 B.R. 31 (S.D.N.Y. 1990); see also In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996) ("As a general proposition, the automatic stay is limited to the debtor, and does not apply to actions against non-debtor third parties."); In re Wolf Fin. Grp., Inc., No. 94-8884A, 1994 WL 913278, at *6 (Bankr. S.D.N.Y. Dec. 15, 1994) ("The stay should not be extended to protect non-debtors from their own wrongdoing").  Accordingly, Metro significantly mischaracterizes the scope of the automatic stay and the purported impropriety of tronc's actions.

36.    The mere fact that if the principal satisfies its obligation it may give rise to a right of recoupment or offset against the agent's claim to collect the pass through of the same amount does not create an automatic stay issue.  That is simply a function of the joint and several liability.  The Bankruptcy Code expressly preserves offset rights in Section 553(a).  Metro is attempting to turn the bankruptcy laws on their head by using the stay as a rationale for unjustly enriching itself by keeping the benefit of the advertising services provided solely by tronc.

37.    Further clarifying the scope of the automatic stay in this instance is the purposeful omission of any relevant statutory guidance requiring an extension of the automatic stay to co-debtors.  Unlike other types of bankruptcy proceedings, a provision requiring a stay of action against co-debtors is omitted from the Chapter 11 provisions of the Bankruptcy Code.  Conversely, 11 U.S.C. § 1301 explicitly sets forth a requirement that in Chapter 13 proceedings a creditor may not act to collect on a debt from an individual that is liable on such debt with a debtor.  Clearly, if Congress intended to extend the automatic stay in Chapter 11 proceedings to co-obligors, co-debtors, or principals, it would have expressly set forth such a requirement akin to that articulated in 11 U.S.C. §1301.  Metro attempts to create a parallel rule where none exists.

WHEREFORE, in consideration of the foregoing, tronc, Inc. respectfully requests that this Court enter an order dismissing Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice, and grant tronc, Inc. such relief, including costs and attorneys' fees, as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Tracy L. Klestadt*
Tracy L. Klestadt
KLESTADT WINTERS JURELLER SOUTHARD
& STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY 10036
(212) 972-3000

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
Helen S. Ward, Esq. (*pro hac vice pending*)

DATE: April 27, 2017                    Attorneys for tronc, Inc.
2465598.v1

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

In re:                                                                    Chapter 11

METRO NEWSPAPER ADVERTISING                       Case No. 17-22445 (RDD)
SERVICES, INC.,

            Debtor.

------------------------------------------------------------X


### <u>CERTIFICATE OF SERVICE</u>

        The undersigned attorney does hereby certify that a true and correct copy of the foregoing

was filed electronically on this 27th day of April, 2017 and accordingly was served upon all

parties currently registered to receive notice via this Court's ECF notification system.


                                                        */s/ Tracy L. Klestadt*

KLESTADT WINTERS JURELLER                    **Hearing Date:  April 28, 2017**
SOUTHARD & STEVENS, LLP                      **Hearing Time: 10:00 a.m.**
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000
Tracy L. Klestadt
TKlestadt@Klestadt.com

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
wkelleher@cohenlaw.com
Helen S. Ward, Esq. (*pro hac vice pending*)
hward@cohenlaw.com

*Attorneys for tronc, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
In re:                                        Chapter 11

METRO NEWSPAPER ADVERTISING            Case No. 17-22445 (RDD)
SERVICES, INC.,

                Debtor.

-----------------------------------------------------------X

**RESPONSE IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN
ORDER (i) DETERMINING TRONC, INC. TO BE IN WILLFUL VIOLATION OF THE
AUTOMATIC STAY AND (ii) DIRECTING TRONC, INC. TO PAY THE DEBTOR'S
COSTS AND FEES INCURRED AND COMPENSATORY DAMAGES SUSTAINED IN
CONNECTION WITH THIS MOTION PURSUANT TO THIS COURT'S CIVIL
CONTEMPT POWERS AND 11 U.S.C. §§ 105(a) and 362(a) AND REQUEST FOR
<u>HEARING ON SHORTENED NOTICE</u>**

TO:    **THE HONORABLE ROBERT D. DRAIN**
       **UNITED STATES BANKRUPTCY JUDGE**

tronc, Inc. ("tronc"), by and through its counsel, hereby responds and objects to Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice (the "Motion"), without consenting to jurisdiction or waiving its jurisdictional objections, as follows:

## FACTUAL BACKGROUND

1.    tronc is a newspaper print and online media publishing company with its principal place of business in Chicago, Illinois.  Originally a division of the Tribune Publishing Company, tronc spun off into a separate entity in 2014, at which point it adopted the name "tronc" (which is short for Tribune online content).  tronc's publications include the Chicago Tribune, Los Angeles Times, San Diego Union Times, Orlando Sentinel, Baltimore Sun, and others.

2.    tronc deals with many agencies that order ads in tronc's publications on behalf of advertisers. Metro served as the advertising agency for numerous advertisers, including the approximately 19 advertisers[1] (the "Clients") whose accounts are at issue in this matter.  The Clients utilized Metro's services as an advertising agency to place advertisements in tronc's newsprint and online publications.

---

[1] While Metro was in fact the agent for other advertisers who placed certain orders with tronc, the advertisers with the largest, outstanding obligation to tronc are as follows: AARP, AB Data Limited, ADT, Blue Shield of CA, Boehringer (LAT), Burger King Corporation, Capital One (CTC), Centene Corp dba Health Net, Dignity Health, Eau Palm Beach Spa, HSBC Bank, Incyte Pharmaceuticals, LG Electronics, Mutual of Omaha, Navy Federal Credit Union, Pentagon Federal, PNC Bank, Sands Bethlehem, and Siemens.

3.      The Clients' procurement of advertising space in tronc's news publications often took place by the Clients contacting tronc through Metro for ad placement.  Metro would often forward to tronc an "Insert Order," on behalf of the Client which specified (1) the advertisement tronc was to publish or insert, (2) the Client's identity, (3) any specific instructions for publication, (4) the commissions due any agencies for agent services ordered (including Metro's), and (5) the total due tronc for the advertisement.  A representative Insert Order is attached as **Exhibit A** to the Declaration of Richard Hausmann in Support of tronc's Response filed contemporaneously herewith ("Hausmann Declaration").  The Insert Order would reflect the commissions to Metro or the other agencies payable by the Client (not tronc).

4.      Frequently, subsequent Change Orders would include changes or other specific information and expressly state and request that tronc "please change the advertising of [Client]." A representative Change Order is attached to the Hausmann Declaration as **Exhibit B**.

5.      Historically, tronc would then place the advertisement in the publication that the Client had selected.  After the advertisement ran, tronc would send Metro an invoice specifying the net amount due and owing to tronc from the Client.  A representative Invoice is attached hereto at **Exhibit C** to the Hausmann Declaration.  The invoices listed a "Net Amount" that reflected the total amount due to tronc, which Metro was to pay or turn over to tronc.  See Exh. C.

6.      On or around March 28, 2017, tronc received notice of Metro's bankruptcy filing and the financial difficulties Metro was facing.  Shortly thereafter, and on numerous occasions, tronc was informed by Metro and other agencies that, due to the bankruptcy filing, many of the advertisers that used Metro for advertising agency services—including many of the Clients— were leaving Metro for other advertising agencies.

3

7.      On April 6, 2017, tronc was informed by a Metro representative that it was closing its doors.   Thereafter, in a good faith effort to collect the millions of dollars in uncollected balances owed to it by the Clients, tronc mailed out letters to the Clients for the advertisements that tronc published on the Clients' behalf (the "Letters").   The Letters, dated April 6 and 7, 2017, inter alia, state that the respective Client owes a balance to tronc for services tronc rendered to and for the benefit of the Client.   The Letters acknowledge Metro's bankruptcy filing but made it clear that tronc was not attempting to collect any debt owed to Metro.   A representative Letter is attached to the Hausmann Declaration as **Exhibit D**.

8.      The Letters do not reference or request the collection of any amounts other than those due directly to tronc for its publications.   See Exh. D.   The invoices provided with the Letters exclude any commissions due or owing to Metro or any other agency.   See Exh. D.

9.      Even though tronc did not issue invoices directly to the Clients prior to the Letters, tronc always maintained that the advertisers and Metro were jointly and severally liable to pay for the publications which is consistent with tronc's Standard Terms and Conditions, as published on tronc's website, which state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."   See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** E to the Hausmann Declaration.

10.      Upon receiving word of the Letters' distribution, counsel for Metro threatened tronc's counsel and demanded that tronc cease and desist tronc's lawful collection activities and asserted that tronc is in violation of the automatic stay.   tronc's counsel responded and explained to Metro's counsel, inter alia, that tronc sought only to collect funds owed directly to tronc by the Clients for tronc's services.   See April 12, 2017 correspondence, attached to the Motion as

4

Exhibit B.  Metro's counsel offered no explanation for his theory that the stay extended to non-debtor parties, but instead filed the Motion on April 18, 2017.

## PROCEDURAL ISSUES

**A.**     ***No Grounds Exist for Metro's Filing of its Motion on an Emergency Basis.***

11.     As an initial matter, Metro inappropriately and unnecessarily filed its Motion on an emergency basis, depriving tronc of a fair opportunity to prepare to address Metro's fabricated allegations.[2]

12.     tronc's lawful actions have not and will not interfere with Metro's ability to collect any amounts due and owing to Metro from any Client.  No immediate harm is imminent to justify the denial of tronc's rights to sufficient notice and due process.  As is obvious from the face of the Letters, tronc seeks only to recover what is owed directly to tronc from parties who are not in bankruptcy (or before the court).  Metro is not currently operating.  Despite Metro's assertions, it is chronologically impossible that tronc's Letters to the Clients was the catalyst for Metro's inevitable demise.  tronc did not send the Letters to the Clients until after Metro's representative informed tronc that Metro was closing its doors.  See Hausmann Declaration, ¶ 13-14.  tronc's actions pose no threat of harm (immediate or otherwise) to Metro or its interests. If the non-debtor Clients pay tronc directly, they may have a right of recoupment or offset, but that is a function of the agency relationships, not a violation of the stay.  See also 11 U.S.C. §553(a).  Metro can not use the automatic stay as a basis for being unjustly enriched by the advertising services furnished by tronc.  Accordingly, this Court should dismiss the Motion or, alternatively, reschedule the hearing until an appropriate time that allows for tronc's collection of all factual information and evidence relevant to the fabricated allegations in the Motion.

---

[2] To the extent necessary, tronc generally denies Metro's allegations in the Motion.

**B.    *Metro's Motion Should Have Been Brought as an Adversary Proceeding.***

13.    Metro's Motion also must be denied because it should have been brought as an adversary proceeding.  Instead, Metro improperly raised its claims through the Motion as a contested matter.

14.    The significance of whether a dispute is to be resolved through an adversary proceeding or as a contested matter is rooted in the procedural rules applicable to each.  An adversary proceeding is governed by Part VII of the Federal Rules of Bankruptcy Procedure and is initiated by the filing of a complaint and service of a summons.  See Fed. R. Bankr. P. 7001. Conversely, a contested matter is initially governed by Rule 9014 and is commenced by the service of a motion.  See Fed. R. Bankr. P. 9014.

15.    Rule 7001 of the Federal Rules of Bankruptcy Procedure dictates when an adversary proceeding is required.  Rule 7001 states that, inter alia, proceedings to recover money or property or to obtain an injunction or other equitable relief are adversary proceedings.  Fed. R. Bankr. P. 7001.

16.    When a party seeks injunctive relief or damages for a violation of the automatic stay, that party must assert its claims through the process of an adversary proceeding.  See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005) (dismissing contested matter proceeding without prejudice because debtor's request for injunctive relief and punitive damages was the type of action that requires commencement of an adversary proceeding); In re McDonald, 265 B.R. 3, 10 (Bankr. D.Mass.2001) (stating that the broad language of Rule 7001(1) permits debtors to bring litigation to recover money for a violation of the automatic stay as an adversary proceeding, and even if the court was in error on this point, the court would be within its discretion under Rule 9014 to order that all the adversary rules in Part VII of the

6

bankruptcy rules would apply in this matter); <u>Matter of Rimsat, Ltd.</u>, 208 B.R. 910, 913 (Bankr. N.D.Ind.1997) (holding that since proceedings seeking to remedy a claimed violation of the automatic stay almost always pursue money, property or injunctive relief, such matters are required to be brought as adversary proceedings); <u>In re Wyatt</u>, 173 B.R. 698, 704 (Bankr. D.Idaho 1994) (finding that action to collect punitive damages for violation of automatic stay should be brought by way of an adversary proceeding).[3]

17.    Metro's Motion seeks, <u>inter alia</u>, injunctive relief, compensatory damages, punitive damages, and attorneys' fees.  The primary relief sought in the Motion is a "cease and desist" injunction.  Claims for these types of relief are expressly identified in Rule 7001 as adversary proceedings, governed by the procedures set forth in Part VII of the Bankruptcy Rules of Civil Procedure.  Therefore, Metro should have raised this matter by filing a complaint with the Court and serving tronc properly with a summons.  The failure to do so must result in the dismissal of the contested matter. <u>See</u>, <u>e.g.</u>, <u>In re Irby</u>, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005); <u>In re McDonald</u>, 265 B.R. 3 (Bankr. D.Mass.2001); <u>Matter of Rimsat, Ltd.</u>, 208 B.R. 910, 913 (Bankr. N.D.Ind.1997); <u>In re Wyatt</u>, 173 B.R. 698, 704 (Bankr. D.Idaho 1994).

18.    Even if this Court holds that Metro was correct to request injunctive relief, damages, and attorney's fees through its Motion, Metro failed to properly serve the Motion under Rule 9014.  Rule 9014(b) states that "[t]he motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule

---

[3] tronc notes for this Court that case law does exist in which a court permitted a debtor to address purported violations of the automatic stay through the procedural process of a contested matter. <u>See</u>, <u>e.g.</u>, <u>In re Hooker Investment, Inc.</u>, 116 B.R. 375, 378 (S.D.N.Y. Bankr. 1990).  Such case law is distinguishable as the immediate motion clearly and primarily seeks injunctive relief, and not simply damages related to purported automatic stay violations.  <u>See id.</u> (which allowed the debtor to bring as a contested matter a claim for relief in the form of a declaration of a stay violation and that such actions were void and expressly acknowledging that the debtor therein was not seeking any injunctive relief but rather, only an automatic stay violation and related damages).  Metro's submission of the allegations in its Motion is nothing but a thinly-veiled attempt to circumvent any perceived inconvenience (or lack of perceived leverage over tronc) Metro would face if it were to bring an adversary proceeding.

9006(d)." Fed. R. Bankr. P. 9014. Metro failed to properly serve its Motion in the manner required by Rule 9014. Instead of serving tronc in the manner prescribed by the Rules, Metro improperly mailed a copy of the motion and notices of hearing to tronc's attorney. tronc had not filed a proof of claim or entered any other appearance in the case, and Metro (or its counsel) never even asked tronc's counsel if she was authorized to accept service. See Affidavits of Service, Doc. Nos. 25 and 27. Accordingly, Metro's Motion should be dismissed.[4]

## LEGAL ARGUMENT

### A. Metro's Relationships With the Clients Were Those of Agent and Principal.

19. Metro's relationships with the Clients were that of agent and principal. As such, the principal Clients are independently liable to tronc for the amounts owed and Metro's Motion must be denied as the disclosed principal and also for unjust enrichment.

20. As an initial matter, Metro's Motion assumes that New York state law on agency applies to the issues at hand. This is not necessarily true. First, tronc's Standard Terms and Conditions state that "all matters arising out of or relating to this Agreement, [are] governed by, and construed in accordance with the substantive law (excluding choice of law provisions) of the state of the relevant publication. See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit E** to the Hausmann Declaration.

21. In the case that this Court finds the choice of law provision to be inapplicable, the Court must apply New York choice-of law provisions. See In re Enron Corp., 367 B.R. 384, 392 (Bankr. Ct. S.D.N.Y. 2007) ("The Court looks to choice-of law rules of New York to resolve any

---

[4] Metro also failed to comply with the minimum notice requirements for its purported service of the Motion, failed to obtain a scheduling order shortening notice, and failed to file an affidavit under Local Rule 9077 attesting to the emergency grounds supporting shortening notice. tronc reserves all rights with respect to these procedural defalcations, but notes that it will be present in Court at the noticed return date and time of the Motion with witnesses present and available to testify should the Court decide to conduct an evidentiary hearing at that time.

8

conflict-of law questions.")  New York utilizes a "significant contacts" analysis in determining the appropriate state law to apply.  In re Worldcom, Inc., 361 B.R. 697 (Bankr. Ct. S.D.N.Y. 2007) ("New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.") (internal quotations omitted).

22.    In the matter at hand, there are numerous states that have contacts with the facts at issue.  The respective Clients are located in cities throughout the country and the advertisements were published in no less than seven states.  None of the ads at issue were published in New York.  The largest amount of Client advertisements for which tronc has not received payment were placed in Illinois and California.  tronc is headquartered in Illinois and incorporated in Delaware.  Upon information and belief, Metro is a New York corporation with a principal place of business in New York.[5]  Because Metro failed to appropriately analyze and set forth the proper choice-of-law considerations and instead assumes that New York state law applies, tronc

---

[5] As stated in the Declaration of Phyllis Cavaliere Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtor's Chapter 11 Petition, however, the Debtor also maintained offices in, inter alia, Chicago and San Francisco before those offices were closed as part of the Debtor's "cost cutting" measures.  See Doc. No. 2, ¶11.

responds to Metro's arguments under New York state law, but reserves the right to object to the

application of New York law to this analysis.[6]

23.    Generally, in New York, the existence of an agency relationship is determined in

light of the facts and circumstances of each case.  Matter of Dean L Burdick Associates, Inc., 19

B.R. 813, 813-14 (Bankr. S.D.N.Y. 1982).   An agency relationship may be established "by

evidence of the consent of one person to allow another to act on his or her behalf and subject to

his or her control, and consent by the other so to act … The agent is a party who acts on behalf of

the principal with the latter's express, implied or apparent authority."  Time Warner City Cable

v. Adelphi University, 27 A.D.3d 551, 552 (N.Y. App. Div. 2006) (internal quotation omitted).

The relationships between Metro and the Clients fit squarely into the category of agent and

principal and, thus, under New York law, primary liability falls to the Clients for the amounts

owed to tronc.

24.    Metro's Motion misstates New York law on agency in relation to advertising

agencies and advertisers for print media.  Contrary to Metro's assertions, this Court has held that

relationships like those between Metro and the Clients are those of agent and principal.   In

Matter of Dean L Burdick Associates, Inc., this Court, by the Honorable Edward J. Ryan, found

an agency relationship between advertising agency and advertiser. 19 B.R. at 814-15.   In

Burdick, this Court explains that print media is a separate industry from television and radio,

---

[6] If the Court determines California or Illinois law applies to this proceeding, this Court should likewise find that an agency relationship exists and deny Metro's Motion.  See In re Hall & Levine Advertising, Inc., 894 F.2d 1344 (C.D. Cal. 1990) (finding that an advertising agency was an agent of the advertiser, citing the agreement between the agency and advertiser and the agency's disclosure of the advertiser as its principal); Store of Happiness v. Carmona & Allen, Inc., 152 Cal.App.2d 266 (Cal. Dist. Ct. App. 1957) (holding that the evidence proved existence of agency relationship, citing provisions of the contract between the advertising agency and the advertiser as well as the fact that the agency sold no goods or other tangibles to sell, nor did it own television time other than that procured for the advertiser.); U.S.C.C. Mgmt. Co. v. Ogden Allied Sec. Servs., Inc., No. 90 C 1389, 1991 WL 274445, at *3 (N.D. Ill. Dec. 13, 1991) (holding that whether an agency relationship exists is a mixed question of fact and law that depends upon the practices of the parties, including the "matter of hiring, direction of servants, the right to terminate the relationship, and the character of supervision of the work done.")

with its own "customs and usages," and states that a publication media is entitled to assume that an advertising agency is seeking space on behalf of a principal. Id. at 815. In coming to its determination, the Court relies upon Clarke v. Watt, a New York state court case. The Court in Clarke v. Watt finds that an advertiser, having received full benefit of the advertising, could not escape payment and deprive the newspaper from fees. 145 N.Y.S. 145 (N.Y. App. Term 1913).

25.    Debtor asserts that there is no agency relationship between it and the Clients, arguing that New York law supports this proposition without addressing the contrary New York authority in the print media industry or even acknowledging or addressing the basic tenant under New York law that "[w]here the identity of the principal is disclosed, there is a presumption that credit is extended only to the principal and not to the agent" and that "[p]ayment alone does not explain…credit arrangements." New York Times v. Glynn-Palmer Associates, Inc., 138 Misc.2d 862, 865 (N.Y. Civ. Ct. 1988); see also American Diabetes Ass'n v. Abbey, Mecca & Co., Inc., 77 A.D.3d 1333-34 (N.Y. App. Div. 2010) (finding that advertising agency acted as agent for clients even where insertion orders placed did not disclose client name on orders where publisher was aware of the client and the insertion orders contained no language suggesting that an agency relationship did not exist).

26.    It is clear from the facts and circumstances in the matter at hand that an agency relationship did exist between Metro and the Clients. For each advertisement, Metro forwarded to tronc an Insert Order identifying the respective Client as well as the specifics of the advertisement to be placed. Following publication, tronc issued invoices setting forth the net amount owed by the Client to tronc. Moreover, industry norms and customs require that an agency relationship be assumed, unless the facts show otherwise. Metro has set forth no

11

evidence that the parties involved intended to contract around the agency dynamic. To the contrary, Metro clearly was acting in its capacity as an agent for its principals, the Clients.

27.    The ultimate liability for the amounts outstanding to tronc for its services rests squarely with each respective Client and tronc's actions in pursing the debts were proper and lawful.

28.    The case law cited by Metro does not contradict the findings in the above cases or support the argument that Metro was not acting as the Clients' agent. Of the three cases cited, Metro relies most heavily on CBS, Inc. v. Stokely-Van Camp, Inc. to support Metro's argument that Metro was not acting as an agent for the Clients. However, as discussed above, in analyzing a factual scenario in print media, as opposed to television and radio, this Court in Burdick distinguishes CBS and finds an agency relationship between the advertising agency and the advertising client. See Burdick, 19 B.R. at 814-15.

29.    Moreover, in Fairchild Publications Division of Capital Cities Media, Inc. v. Rosston, Kremer & Slawter, Inc., 584 N.Y.S.2d 389 (N.Y. Sup. Ct. 1992) the Court states that it is actually undisputed that an agency relationship existed between an advertising agency and advertiser, but that the media company successfully proved that the advertiser should be nonetheless held liable for debts owed by showing that: (1) the advertising agency agreed to be liable for the debts of the advertising company and (2) custom and usage rendered the advertising agency liable.    The facts in this instance will show that both the advertisers and Metro are liable for outstanding obligations due and owing to tronc. Here, the relationship between the parties as well as the custom and usage[7] establish that both Metro as agent and the

---

[7] As the court in Burdick specifically finds, in the print media publishing industry, custom and usage indicate an agency relationship.  See Burdick, 19 B.R. at 814-15.

Client as principal were co-obligors on the tronc obligations and certainly never contemplated or established that the liability to tronc was solely Metro's.

30.     Likewise, in <u>Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island</u>, 59 Misc.2d 268 (N.Y. Dist. Ct. 1969) the Court assumes that a de facto agency relationship exists, but finds that the particular circumstances of that case result in financial liability of the agent instead of the principal.  Ultimately, the court finds that the terms in the insert orders sent by the advertising agency to the media company constituted contractual agreements, which specifically excluded recovery by the media entity from the advertising party.  <u>Id.</u> at 270-71.  The Insert Orders that Metro forwarded to tronc include no provision excluding recovery or collection from the Clients and, thus, the analysis in <u>Huntington</u> is inapplicable to the issues at hand.

### B.     *Metro's Motion Misconstrues the Automatic Stay Protections*

31.     Beyond Metro's incorrect characterization of the facts and New York agency law, Metro also grossly misconstrues the application of the automatic stay under Section 362(a)(3) of the Bankruptcy Code when it argues for the purported voidabilty of any payments made to tronc by the Clients that received and benefitted from the services provided by tronc, and that are directly and independently liable to tronc for such services.[8]

32.     If this Court were to follow Metro's logic and reasoning, the practical effect would be that the bankruptcy of an agent relieves the principal of liability to a third party.  No aspect of bankruptcy permits or sanctions that result.  Indeed, the Bankruptcy Code says precisely the opposite.  Section 524(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity on, or the property of any other entity for, such debt.**"  11 U.S.C. § 524(e) (emphasis added).

---

[8] tronc's standard terms and conditions, as published on tronc's website, are consistent with tronc's position in this Response and state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."  http://www.tribpub.com/ad-io-terms/  <u>See</u> Exh. E.

33.    Nothing in section 362 changes the general rule enunciated in section 524(e), nor does it prohibit a party from enforcing its rights against a non-debtor, even if that non-debtor is a co-obligor with a debtor.

34.    As is obvious from the face of the Letters, tronc is in no way pursuing any assets or property of Metro or its estate.  tronc is not seeking to collect any receivable due and owing to Metro or any other party.  Rather, tronc is seeking to collect debts from non-debtors who are directly liable for, and received the benefit of, the services provided by tronc.  The invoices enclosed with the Letters clearly demonstrate that tronc is only collecting from the Clients the value of the advertising services provided by tronc.  Metro did not provide any of those published advertising services.

35.    Even though Metro and the Clients are jointly liable to tronc for the amounts owed, the automatic stay applies to proceedings against a debtor and does not apply to any other entity.   The automatic stay does not apply to nonbankrupt co-defendants or co-obligors and is not intended to give an unwarranted immunity from suit to solvent co-debtors, which itself would "contravene the purposes underlying the automatic stay."  See, e.g. CAE Industries Ltd. v. Aerospace Holdings, Co., 116 B.R. 31 (S.D.N.Y. 1990); see also In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996) ("As a general proposition, the automatic stay is limited to the debtor, and does not apply to actions against non-debtor third parties."); In re Wolf Fin. Grp., Inc., No. 94-8884A, 1994 WL 913278, at *6 (Bankr. S.D.N.Y. Dec. 15, 1994) ("The stay should not be extended to protect non-debtors from their own wrongdoing.").  Accordingly, Metro significantly mischaracterizes the scope of the automatic stay and the purported impropriety of tronc's actions.

36.    The mere fact that if the principal satisfies its obligation it may give rise to a right of recoupment or offset against the agent's claim to collect the pass through of the same amount does not create an automatic stay issue.    That is simply a function of the joint and several liability.    The Bankruptcy Code expressly preserves offset rights in Section 553(a).    Metro is attempting to turn the bankruptcy laws on their head by using the stay as a rationale for unjustly enriching itself by keeping the benefit of the advertising services provided solely by tronc.

37.    Further clarifying the scope of the automatic stay in this instance is the purposeful omission of any relevant statutory guidance requiring an extension of the automatic stay to co-debtors.    Unlike other types of bankruptcy proceedings, a provision requiring a stay of action against co-debtors is omitted from the Chapter 11 provisions of the Bankruptcy Code.    Conversely, 11 U.S.C. § 1301 explicitly sets forth a requirement that in Chapter 13 proceedings a creditor may not act to collect on a debt from an individual that is liable on such debt with a debtor.    Clearly, if Congress intended to extend the automatic stay in Chapter 11 proceedings to co-obligors, co-debtors, or principals, it would have expressly set forth such a requirement akin to that articulated in 11 U.S.C. §1301.    Metro attempts to create a parallel rule where none exists.

15

WHEREFORE, in consideration of the foregoing, tronc, Inc. respectfully requests that this Court enter an order dismissing Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice, and grant tronc, Inc. such relief, including costs and attorneys' fees, as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Tracy L. Klestadt*
Tracy L. Klestadt
KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY 10036
(212) 972-3000

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
Helen S. Ward, Esq. (*pro hac vice pending*)

DATE: April 27, 2017
2465598.v1

Attorneys for tronc, Inc.

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

In re:                                                      Chapter 11

METRO NEWSPAPER ADVERTISING                 Case No. 17-22445 (RDD)
SERVICES, INC.,

        Debtor.

------------------------------------------------------------X


<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned attorney does hereby certify that a true and correct copy of the foregoing

was filed electronically on this 27th day of April, 2017 and accordingly was served upon all

parties currently registered to receive notice via this Court's ECF notification system.


*/s/ Tracy L. Klestadt*

KLESTADT WINTERS JURELLER                    **Hearing Date:  April 28, 2017**
SOUTHARD & STEVENS, LLP                      **Hearing Time: 10:00 a.m.**
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000
Tracy L. Klestadt
TKlestadt@Klestadt.com

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
wkelleher@cohenlaw.com
Helen S. Ward, Esq. (*pro hac vice pending*)
hward@cohenlaw.com

*Attorneys for tronc, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

In re:                                       Chapter 11

METRO NEWSPAPER ADVERTISING                  Case No. 17-22445 (RDD)
SERVICES, INC.,

            Debtor.

------------------------------------------------------------X


**RESPONSE IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN**
**ORDER (i) DETERMINING TRONC, INC. TO BE IN WILLFUL VIOLATION OF THE**
**AUTOMATIC STAY AND (ii) DIRECTING TRONC, INC. TO PAY THE DEBTOR'S**
**COSTS AND FEES INCURRED AND COMPENSATORY DAMAGES SUSTAINED IN**
**CONNECTION WITH THIS MOTION PURSUANT TO THIS COURT'S CIVIL**
**CONTEMPT POWERS AND 11 U.S.C. §§ 105(a) and 362(a) AND REQUEST FOR**
**<u>HEARING ON SHORTENED NOTICE</u>**

TO:    **THE HONORABLE ROBERT D. DRAIN**
       **UNITED STATES BANKRUPTCY JUDGE**

tronc, Inc. ("tronc"), by and through its counsel, hereby responds and objects to Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice (the "Motion"), without consenting to jurisdiction or waiving its jurisdictional objections, as follows:

## FACTUAL BACKGROUND

1.      tronc is a newspaper print and online media publishing company with its principal place of business in Chicago, Illinois.  Originally a division of the Tribune Publishing Company, tronc spun off into a separate entity in 2014, at which point it adopted the name "tronc" (which is short for Tribune online content).  tronc's publications include the Chicago Tribune, Los Angeles Times, San Diego Union Times, Orlando Sentinel, Baltimore Sun, and others.

2.      tronc deals with many agencies that order ads in tronc's publications on behalf of advertisers.  Metro served as the advertising agency for numerous advertisers, including the approximately 19 advertisers[1] (the "Clients") whose accounts are at issue in this matter.  The Clients utilized Metro's services as an advertising agency to place advertisements in tronc's newsprint and online publications.

---

[1] While Metro was in fact the agent for other advertisers who placed certain orders with tronc, the advertisers with the largest, outstanding obligation to tronc are as follows: AARP, AB Data Limited, ADT, Blue Shield of CA, Boehringer (LAT), Burger King Corporation, Capital One (CTC), Centene Corp dba Health Net, Dignity Health, Eau Palm Beach Spa, HSBC Bank, Incyte Pharmaceuticals, LG Electronics, Mutual of Omaha, Navy Federal Credit Union, Pentagon Federal, PNC Bank, Sands Bethlehem, and Siemens.

3.      The Clients' procurement of advertising space in tronc's news publications often took place by the Clients contacting tronc through Metro for ad placement.  Metro would often forward to tronc an "Insert Order," on behalf of the Client which specified (1) the advertisement tronc was to publish or insert, (2) the Client's identity, (3) any specific instructions for publication, (4) the commissions due any agencies for agent services ordered (including Metro's), and (5) the total due tronc for the advertisement.  A representative Insert Order is attached as **Exhibit A** to the Declaration of Richard Hausmann in Support of tronc's Response filed contemporaneously herewith ("Hausmann Declaration").  The Insert Order would reflect the commissions to Metro or the other agencies payable by the Client (not tronc).

4.      Frequently, subsequent Change Orders would include changes or other specific information and expressly state and request that tronc "please change the advertising of [Client]." A representative Change Order is attached to the Hausmann Declaration as **Exhibit B**.

5.      Historically, tronc would then place the advertisement in the publication that the Client had selected.  After the advertisement ran, tronc would send Metro an invoice specifying the net amount due and owing to tronc from the Client.  A representative Invoice is attached hereto at **Exhibit C** to the Hausmann Declaration.  The invoices listed a "Net Amount" that reflected the total amount due to tronc, which Metro was to pay or turn over to tronc.  See Exh. C.

6.      On or around March 28, 2017, tronc received notice of Metro's bankruptcy filing and the financial difficulties Metro was facing.  Shortly thereafter, and on numerous occasions, tronc was informed by Metro and other agencies that, due to the bankruptcy filing, many of the advertisers that used Metro for advertising agency services—including many of the Clients— were leaving Metro for other advertising agencies.

3

7.      On April 6, 2017, tronc was informed by a Metro representative that it was closing its doors.   Thereafter, in a good faith effort to collect the millions of dollars in uncollected balances owed to it by the Clients, tronc mailed out letters to the Clients for the advertisements that tronc published on the Clients' behalf (the "Letters").   The Letters, dated April 6 and 7, 2017, inter alia, state that the respective Client owes a balance to tronc for services tronc rendered to and for the benefit of the Client.   The Letters acknowledge Metro's bankruptcy filing but made it clear that tronc was not attempting to collect any debt owed to Metro.   A representative Letter is attached to the Hausmann Declaration as **Exhibit D**.

8.      The Letters do not reference or request the collection of any amounts other than those due directly to tronc for its publications.   See Exh. D.   The invoices provided with the Letters exclude any commissions due or owing to Metro or any other agency.   See Exh. D.

9.      Even though tronc did not issue invoices directly to the Clients prior to the Letters, tronc always maintained that the advertisers and Metro were jointly and severally liable to pay for the publications which is consistent with tronc's Standard Terms and Conditions, as published on tronc's website, which state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."   See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** E to the Hausmann Declaration.

10.      Upon receiving word of the Letters' distribution, counsel for Metro threatened tronc's counsel and demanded that tronc cease and desist tronc's lawful collection activities and asserted that tronc is in violation of the automatic stay.   tronc's counsel responded and explained to Metro's counsel, inter alia, that tronc sought only to collect funds owed directly to tronc by the Clients for tronc's services.   See April 12, 2017 correspondence, attached to the Motion as

4

Exhibit B.  Metro's counsel offered no explanation for his theory that the stay extended to non-debtor parties, but instead filed the Motion on April 18, 2017.

## PROCEDURAL ISSUES

### A.    *No Grounds Exist for Metro's Filing of its Motion on an Emergency Basis.*

11.    As an initial matter, Metro inappropriately and unnecessarily filed its Motion on an emergency basis, depriving tronc of a fair opportunity to prepare to address Metro's fabricated allegations.[2]

12.    tronc's lawful actions have not and will not interfere with Metro's ability to collect any amounts due and owing to Metro from any Client.  No immediate harm is imminent to justify the denial of tronc's rights to sufficient notice and due process.  As is obvious from the face of the Letters, tronc seeks only to recover what is owed directly to tronc from parties who are not in bankruptcy (or before the court).  Metro is not currently operating.  Despite Metro's assertions, it is chronologically impossible that tronc's Letters to the Clients was the catalyst for Metro's inevitable demise.  tronc did not send the Letters to the Clients until after Metro's representative informed tronc that Metro was closing its doors.  See Hausmann Declaration, ¶ 13-14.  tronc's actions pose no threat of harm (immediate or otherwise) to Metro or its interests.  If the non-debtor Clients pay tronc directly, they may have a right of recoupment or offset, but that is a function of the agency relationships, not a violation of the stay.  See also 11 U.S.C. §553(a).  Metro can not use the automatic stay as a basis for being unjustly enriched by the advertising services furnished by tronc.  Accordingly, this Court should dismiss the Motion or, alternatively, reschedule the hearing until an appropriate time that allows for tronc's collection of all factual information and evidence relevant to the fabricated allegations in the Motion.

---

[2] To the extent necessary, tronc generally denies Metro's allegations in the Motion.

### B.    Metro's Motion Should Have Been Brought as an Adversary Proceeding.

13.    Metro's Motion also must be denied because it should have been brought as an adversary proceeding.  Instead, Metro improperly raised its claims through the Motion as a contested matter.

14.    The significance of whether a dispute is to be resolved through an adversary proceeding or as a contested matter is rooted in the procedural rules applicable to each.  An adversary proceeding is governed by Part VII of the Federal Rules of Bankruptcy Procedure and is initiated by the filing of a complaint and service of a summons.  See Fed. R. Bankr. P. 7001. Conversely, a contested matter is initially governed by Rule 9014 and is commenced by the service of a motion.  See Fed. R. Bankr. P. 9014.

15.    Rule 7001 of the Federal Rules of Bankruptcy Procedure dictates when an adversary proceeding is required.  Rule 7001 states that, inter alia, proceedings to recover money or property or to obtain an injunction or other equitable relief are adversary proceedings.  Fed. R. Bankr. P. 7001.

16.    When a party seeks injunctive relief or damages for a violation of the automatic stay, that party must assert its claims through the process of an adversary proceeding.  See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005) (dismissing contested matter proceeding without prejudice because debtor's request for injunctive relief and punitive damages was the type of action that requires commencement of an adversary proceeding); In re McDonald, 265 B.R. 3, 10 (Bankr. D.Mass.2001) (stating that the broad language of Rule 7001(1) permits debtors to bring litigation to recover money for a violation of the automatic stay as an adversary proceeding, and even if the court was in error on this point, the court would be within its discretion under Rule 9014 to order that all the adversary rules in Part VII of the

6

bankruptcy rules would apply in this matter); <u>Matter of Rimsat, Ltd.</u>, 208 B.R. 910, 913 (Bankr. N.D.Ind.1997) (holding that since proceedings seeking to remedy a claimed violation of the automatic stay almost always pursue money, property or injunctive relief, such matters are required to be brought as adversary proceedings); <u>In re Wyatt</u>, 173 B.R. 698, 704 (Bankr. D.Idaho 1994) (finding that action to collect punitive damages for violation of automatic stay should be brought by way of an adversary proceeding).[3]

17.    Metro's Motion seeks, <u>inter alia</u>, injunctive relief, compensatory damages, punitive damages, and attorneys' fees.  The primary relief sought in the Motion is a "cease and desist" injunction.  Claims for these types of relief are expressly identified in Rule 7001 as adversary proceedings, governed by the procedures set forth in Part VII of the Bankruptcy Rules of Civil Procedure.  Therefore, Metro should have raised this matter by filing a complaint with the Court and serving tronc properly with a summons.  The failure to do so must result in the dismissal of the contested matter. <u>See</u>, <u>e.g.</u>, <u>In re Irby</u>, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005); <u>In re McDonald</u>, 265 B.R. 3 (Bankr. D.Mass.2001); <u>Matter of Rimsat, Ltd.</u>, 208 B.R. 910, 913 (Bankr. N.D.Ind.1997); <u>In re Wyatt</u>, 173 B.R. 698, 704 (Bankr. D.Idaho 1994).

18.    Even if this Court holds that Metro was correct to request injunctive relief, damages, and attorney's fees through its Motion, Metro failed to properly serve the Motion under Rule 9014.  Rule 9014(b) states that "[t]he motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule

---

[3] tronc notes for this Court that case law does exist in which a court permitted a debtor to address purported violations of the automatic stay through the procedural process of a contested matter.  <u>See</u>, <u>e.g.</u>, <u>In re Hooker Investment, Inc.</u>, 116 B.R. 375, 378 (S.D.N.Y. Bankr. 1990).  Such case law is distinguishable as the immediate motion clearly and primarily seeks injunctive relief, and not simply damages related to purported automatic stay violations.  <u>See id</u>. (which allowed the debtor to bring as a contested matter a claim for relief in the form of a declaration of a stay violation and that such actions were void and expressly acknowledging that the debtor therein was not seeking any injunctive relief but rather, only an automatic stay violation and related damages).  Metro's submission of the allegations in its Motion is nothing but a thinly-veiled attempt to circumvent any perceived inconvenience (or lack of perceived leverage over tronc) Metro would face if it were to bring an adversary proceeding.

9006(d)."  Fed. R. Bankr. P. 9014.  Metro failed to properly serve its Motion in the manner

required by Rule 9014.  Instead of serving tronc in the manner prescribed by the Rules, Metro

improperly mailed a copy of the motion and notices of hearing to tronc's attorney.  tronc had not

filed a proof of claim or entered any other appearance in the case, and Metro (or its counsel)

never even asked tronc's counsel if she was authorized to accept service.  See Affidavits of

Service, Doc. Nos. 25 and 27.  Accordingly, Metro's Motion should be dismissed.[4]

## **LEGAL ARGUMENT**

### *A.    Metro's Relationships With the Clients Were Those of Agent and Principal.*

19.     Metro's relationships with the Clients were that of agent and principal.  As such,

the principal Clients are independently liable to tronc for the amounts owed and Metro's Motion

must be denied as the disclosed principal and also for unjust enrichment.

20.     As an initial matter, Metro's Motion assumes that New York state law on agency

applies to the issues at hand.  This is not necessarily true.  First, tronc's Standard Terms and

Conditions state that "all matters arising out of or relating to this Agreement, [are] governed by,

and construed in accordance with the substantive law (excluding choice of law provisions) of the

state of the relevant publication. See Advertising Agreement Standard Terms and Conditions for

Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** E to the Hausmann

Declaration.

21.     In the case that this Court finds the choice of law provision to be inapplicable, the

Court must apply New York choice-of law provisions.  See In re Enron Corp., 367 B.R. 384, 392

(Bankr. Ct. S.D.N.Y. 2007) ("The Court looks to choice-of law rules of New York to resolve any

---

[4] Metro also failed to comply with the minimum notice requirements for its purported service of the Motion, failed to obtain a scheduling order shortening notice, and failed to file an affidavit under Local Rule 9077 attesting to the emergency grounds supporting shortening notice.  tronc reserves all rights with respect to these procedural defalcations, but notes that it will be present in Court at the noticed return date and time of the Motion with witnesses present and available to testify should the Court decide to conduct an evidentiary hearing at that time.

conflict-of law questions.")  New York utilizes a "significant contacts" analysis in determining the appropriate state law to apply.  In re Worldcom, Inc., 361 B.R. 697 (Bankr. Ct. S.D.N.Y. 2007) ("New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.") (internal quotations omitted).

22.     In the matter at hand, there are numerous states that have contacts with the facts at issue.  The respective Clients are located in cities throughout the country and the advertisements were published in no less than seven states.  None of the ads at issue were published in New York.  The largest amount of Client advertisements for which tronc has not received payment were placed in Illinois and California.  tronc is headquartered in Illinois and incorporated in Delaware.  Upon information and belief, Metro is a New York corporation with a principal place of business in New York.[5]  Because Metro failed to appropriately analyze and set forth the proper choice-of-law considerations and instead assumes that New York state law applies, tronc

---

[5] As stated in the Declaration of Phyllis Cavaliere Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtor's Chapter 11 Petition, however, the Debtor also maintained offices in, inter alia, Chicago and San Francisco before those offices were closed as part of the Debtor's "cost cutting" measures.  See Doc. No. 2, ¶11.

9

responds to Metro's arguments under New York state law, but reserves the right to object to the application of New York law to this analysis.[6]

23.    Generally, in New York, the existence of an agency relationship is determined in light of the facts and circumstances of each case.  Matter of Dean L Burdick Associates, Inc., 19 B.R. 813, 813-14 (Bankr. S.D.N.Y. 1982).  An agency relationship may be established "by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act … The agent is a party who acts on behalf of the principal with the latter's express, implied or apparent authority."  Time Warner City Cable v. Adelphi University, 27 A.D.3d 551, 552 (N.Y. App. Div. 2006) (internal quotation omitted). The relationships between Metro and the Clients fit squarely into the category of agent and principal and, thus, under New York law, primary liability falls to the Clients for the amounts owed to tronc.

24.    Metro's Motion misstates New York law on agency in relation to advertising agencies and advertisers for print media.  Contrary to Metro's assertions, this Court has held that relationships like those between Metro and the Clients are those of agent and principal.   In Matter of Dean L Burdick Associates, Inc., this Court, by the Honorable Edward J. Ryan, found an agency relationship between advertising agency and advertiser. 19 B.R. at 814-15.   In Burdick, this Court explains that print media is a separate industry from television and radio,

---

[6] If the Court determines California or Illinois law applies to this proceeding, this Court should likewise find that an agency relationship exists and deny Metro's Motion.  See In re Hall & Levine Advertising, Inc., 894 F.2d 1344 (C.D. Cal. 1990) (finding that an advertising agency was an agent of the advertiser, citing the agreement between the agency and advertiser and the agency's disclosure of the advertiser as its principal); Store of Happiness v. Carmona & Allen, Inc., 152 Cal.App.2d 266 (Cal. Dist. Ct. App. 1957) (holding that the evidence proved existence of agency relationship, citing provisions of the contract between the advertising agency and the advertiser as well as the fact that the agency sold no goods or other tangibles to sell, nor did it own television time other than that procured for the advertiser.); U.S.C.C. Mgmt. Co. v. Ogden Allied Sec. Servs., Inc., No. 90 C 1389, 1991 WL 274445, at *3 (N.D. Ill. Dec. 13, 1991) (holding that whether an agency relationship exists is a mixed question of fact and law that depends upon the practices of the parties, including the "matter of hiring, direction of servants, the right to terminate the relationship, and the character of supervision of the work done.")

with its own "customs and usages," and states that a publication media is entitled to assume that an advertising agency is seeking space on behalf of a principal. Id. at 815.  In coming to its determination, the Court relies upon Clarke v. Watt, a New York state court case.  The Court in Clarke v. Watt finds that an advertiser, having received full benefit of the advertising, could not escape payment and deprive the newspaper from fees. 145 N.Y.S. 145 (N.Y. App. Term 1913).

25.    Debtor asserts that there is no agency relationship between it and the Clients, arguing that New York law supports this proposition without addressing the contrary New York authority in the print media industry or even acknowledging or addressing the basic tenant under New York law that "[w]here the identity of the principal is disclosed, there is a presumption that credit is extended only to the principal and not to the agent" and that "[p]ayment alone does not explain…credit arrangements."  New York Times v. Glynn-Palmer Associates, Inc., 138 Misc.2d 862, 865 (N.Y. Civ. Ct. 1988); see also American Diabetes Ass'n v. Abbey, Mecca & Co., Inc., 77 A.D.3d 1333-34 (N.Y. App. Div. 2010) (finding that advertising agency acted as agent for clients even where insertion orders placed did not disclose client name on orders where publisher was aware of the client and the insertion orders contained no language suggesting that an agency relationship did not exist).

26.    It is clear from the facts and circumstances in the matter at hand that an agency relationship did exist between Metro and the Clients.  For each advertisement, Metro forwarded to tronc an Insert Order identifying the respective Client as well as the specifics of the advertisement to be placed.  Following publication, tronc issued invoices setting forth the net amount owed by the Client to tronc.  Moreover, industry norms and customs require that an agency relationship be assumed, unless the facts show otherwise.  Metro has set forth no

11

evidence that the parties involved intended to contract around the agency dynamic.   To the contrary, Metro clearly was acting in its capacity as an agent for its principals, the Clients.

27.    The ultimate liability for the amounts outstanding to tronc for its services rests squarely with each respective Client and tronc's actions in pursing the debts were proper and lawful.

28.    The case law cited by Metro does not contradict the findings in the above cases or support the argument that Metro was not acting as the Clients' agent.   Of the three cases cited, Metro relies most heavily on CBS, Inc. v. Stokely-Van Camp, Inc. to support Metro's argument that Metro was not acting as an agent for the Clients.   However, as discussed above, in analyzing a factual scenario in print media, as opposed to television and radio, this Court in Burdick distinguishes CBS and finds an agency relationship between the advertising agency and the advertising client.   See Burdick, 19 B.R. at 814-15.

29.    Moreover, in Fairchild Publications Division of Capital Cities Media, Inc. v. Rosston, Kremer & Slawter, Inc., 584 N.Y.S.2d 389 (N.Y. Sup. Ct. 1992) the Court states that it is actually undisputed that an agency relationship existed between an advertising agency and advertiser, but that the media company successfully proved that the advertiser should be nonetheless held liable for debts owed by showing that: (1) the advertising agency agreed to be liable for the debts of the advertising company and (2) custom and usage rendered the advertising agency liable.    The facts in this instance will show that both the advertisers and Metro are liable for outstanding obligations due and owing to tronc. Here, the relationship between the parties as well as the custom and usage[7] establish that both Metro as agent and the

---

[7] As the court in Burdick specifically finds, in the print media publishing industry, custom and usage indicate an agency relationship.  See Burdick, 19 B.R. at 814-15.

Client as principal were co-obligors on the tronc obligations and certainly never contemplated or established that the liability to tronc was solely Metro's.

30.    Likewise, in <u>Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island</u>, 59 Misc.2d 268 (N.Y. Dist. Ct. 1969) the Court assumes that a de facto agency relationship exists, but finds that the particular circumstances of that case result in financial liability of the agent instead of the principal.  Ultimately, the court finds that the terms in the insert orders sent by the advertising agency to the media company constituted contractual agreements, which specifically excluded recovery by the media entity from the advertising party.  <u>Id.</u> at 270-71.  The Insert Orders that Metro forwarded to tronc include no provision excluding recovery or collection from the Clients and, thus, the analysis in <u>Huntington</u> is inapplicable to the issues at hand.

### B.    Metro's Motion Misconstrues the Automatic Stay Protections

31.    Beyond Metro's incorrect characterization of the facts and New York agency law, Metro also grossly misconstrues the application of the automatic stay under Section 362(a)(3) of the Bankruptcy Code when it argues for the purported voidabilty of any payments made to tronc by the Clients that received and benefitted from the services provided by tronc, and that are directly and independently liable to tronc for such services.[8]

32.    If this Court were to follow Metro's logic and reasoning, the practical effect would be that the bankruptcy of an agent relieves the principal of liability to a third party.  No aspect of bankruptcy permits or sanctions that result.  Indeed, the Bankruptcy Code says precisely the opposite.  Section 524(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity on, or the property of any other entity for, such debt.**"  11 U.S.C. § 524(e) (emphasis added).

---

[8] tronc's standard terms and conditions, as published on tronc's website, are consistent with tronc's position in this Response and state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."  http://www.tribpub.com/ad-io-terms/  <u>See</u> Exh. E.

33.    Nothing in section 362 changes the general rule enunciated in section 524(e), nor does it prohibit a party from enforcing its rights against a non-debtor, even if that non-debtor is a co-obligor with a debtor.

34.    As is obvious from the face of the Letters, tronc is in no way pursuing any assets or property of Metro or its estate.  tronc is not seeking to collect any receivable due and owing to Metro or any other party.  Rather, tronc is seeking to collect debts from non-debtors who are directly liable for, and received the benefit of, the services provided by tronc.  The invoices enclosed with the Letters clearly demonstrate that tronc is only collecting from the Clients the value of the advertising services provided by tronc.  Metro did not provide any of those published advertising services.

35.    Even though Metro and the Clients are jointly liable to tronc for the amounts owed, the automatic stay applies to proceedings against a debtor and does not apply to any other entity.  The automatic stay does not apply to nonbankrupt co-defendants or co-obligors and is not intended to give an unwarranted immunity from suit to solvent co-debtors, which itself would "contravene the purposes underlying the automatic stay."  See, e.g. CAE Industries Ltd. v. Aerospace Holdings, Co., 116 B.R. 31 (S.D.N.Y. 1990); see also In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996) ("As a general proposition, the automatic stay is limited to the debtor, and does not apply to actions against non-debtor third parties."); In re Wolf Fin. Grp., Inc., No. 94-8884A, 1994 WL 913278, at *6 (Bankr. S.D.N.Y. Dec. 15, 1994) ("The stay should not be extended to protect non-debtors from their own wrongdoing.").  Accordingly, Metro significantly mischaracterizes the scope of the automatic stay and the purported impropriety of tronc's actions.

36.     The mere fact that if the principal satisfies its obligation it may give rise to a right of recoupment or offset against the agent's claim to collect the pass through of the same amount does not create an automatic stay issue.   That is simply a function of the joint and several liability.   The Bankruptcy Code expressly preserves offset rights in Section 553(a).   Metro is attempting to turn the bankruptcy laws on their head by using the stay as a rationale for unjustly enriching itself by keeping the benefit of the advertising services provided solely by tronc.

37.     Further clarifying the scope of the automatic stay in this instance is the purposeful omission of any relevant statutory guidance requiring an extension of the automatic stay to co-debtors.   Unlike other types of bankruptcy proceedings, a provision requiring a stay of action against co-debtors is omitted from the Chapter 11 provisions of the Bankruptcy Code.   Conversely, 11 U.S.C. § 1301 explicitly sets forth a requirement that in Chapter 13 proceedings a creditor may not act to collect on a debt from an individual that is liable on such debt with a debtor.   Clearly, if Congress intended to extend the automatic stay in Chapter 11 proceedings to co-obligors, co-debtors, or principals, it would have expressly set forth such a requirement akin to that articulated in 11 U.S.C. §1301.   Metro attempts to create a parallel rule where none exists.

WHEREFORE, in consideration of the foregoing, tronc, Inc. respectfully requests that this Court enter an order dismissing Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice, and grant tronc, Inc. such relief, including costs and attorneys' fees, as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Tracy L. Klestadt*
Tracy L. Klestadt
KLESTADT WINTERS JURELLER SOUTHARD
& STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
Helen S. Ward, Esq. (*pro hac vice pending*)

DATE:  April 27, 2017                    Attorneys for tronc, Inc.
2465598.v1

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

In re:                                               Chapter 11

METRO NEWSPAPER ADVERTISING                          Case No. 17-22445 (RDD)
SERVICES, INC.,

        Debtor.

------------------------------------------------------------X


<u>**CERTIFICATE OF SERVICE**</u>

        The undersigned attorney does hereby certify that a true and correct copy of the foregoing

was filed electronically on this 27th day of April, 2017 and accordingly was served upon all

parties currently registered to receive notice via this Court's ECF notification system.




                                          */s/ Tracy L. Klestadt*

KLESTADT WINTERS JURELLER                    **Hearing Date:  April 28, 2017**
SOUTHARD & STEVENS, LLP                      **Hearing Time: 10:00 a.m.**
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000
Tracy L. Klestadt
TKlestadt@Klestadt.com

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
wkelleher@cohenlaw.com
Helen S. Ward, Esq. (*pro hac vice pending*)
hward@cohenlaw.com

*Attorneys for tronc, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
In re:                                       Chapter 11

METRO NEWSPAPER ADVERTISING                  Case No. 17-22445 (RDD)
SERVICES, INC.,

                    Debtor.

-----------------------------------------------------------X

**RESPONSE IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN
ORDER (i) DETERMINING TRONC, INC. TO BE IN WILLFUL VIOLATION OF THE
AUTOMATIC STAY AND (ii) DIRECTING TRONC, INC. TO PAY THE DEBTOR'S
COSTS AND FEES INCURRED AND COMPENSATORY DAMAGES SUSTAINED IN
CONNECTION WITH THIS MOTION PURSUANT TO THIS COURT'S CIVIL
CONTEMPT POWERS AND 11 U.S.C. §§ 105(a) and 362(a) AND REQUEST FOR
<u>HEARING ON SHORTENED NOTICE</u>**

**TO:** **THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

tronc, Inc. ("tronc"), by and through its counsel, hereby responds and objects to Debtor's

Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The

Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred

And Compensatory Damages Sustained In Connection With This Motion Pursuant To This

Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing

On Shortened Notice (the "Motion"), without consenting to jurisdiction or waiving its

jurisdictional objections, as follows:

## FACTUAL BACKGROUND

1.      tronc is a newspaper print and online media publishing company with its principal

place of business in Chicago, Illinois.  Originally a division of the Tribune Publishing Company,

tronc spun off into a separate entity in 2014, at which point it adopted the name "tronc" (which is

short for Tribune online content).  tronc's publications include the Chicago Tribune, Los Angeles

Times, San Diego Union Times, Orlando Sentinel, Baltimore Sun, and others.

2.      tronc deals with many agencies that order ads in tronc's publications on behalf of

advertisers.  Metro served as the advertising agency for numerous advertisers, including the

approximately 19 advertisers[1] (the "Clients") whose accounts are at issue in this matter.  The

Clients utilized Metro's services as an advertising agency to place advertisements in tronc's

newsprint and online publications.

---

[1] While Metro was in fact the agent for other advertisers who placed certain orders with tronc, the advertisers with
the largest, outstanding obligation to tronc are as follows: AARP, AB Data Limited, ADT, Blue Shield of CA,
Boehringer (LAT), Burger King Corporation, Capital One (CTC), Centene Corp dba Health Net, Dignity Health,
Eau Palm Beach Spa, HSBC Bank, Incyte Pharmaceuticals, LG Electronics, Mutual of Omaha, Navy Federal Credit
Union, Pentagon Federal, PNC Bank, Sands Bethlehem, and Siemens.

3.      The Clients' procurement of advertising space in tronc's news publications often took place by the Clients contacting tronc through Metro for ad placement.  Metro would often forward to tronc an "Insert Order," on behalf of the Client which specified (1) the advertisement tronc was to publish or insert, (2) the Client's identity, (3) any specific instructions for publication, (4) the commissions due any agencies for agent services ordered (including Metro's), and (5) the total due tronc for the advertisement.  A representative Insert Order is attached as **Exhibit A** to the Declaration of Richard Hausmann in Support of tronc's Response filed contemporaneously herewith ("Hausmann Declaration").  The Insert Order would reflect the commissions to Metro or the other agencies payable by the Client (not tronc).

4.      Frequently, subsequent Change Orders would include changes or other specific information and expressly state and request that tronc "please change the advertising of [Client]." A representative Change Order is attached to the Hausmann Declaration as **Exhibit B**.

5.      Historically, tronc would then place the advertisement in the publication that the Client had selected.  After the advertisement ran, tronc would send Metro an invoice specifying the net amount due and owing to tronc from the Client.  A representative Invoice is attached hereto at **Exhibit C** to the Hausmann Declaration.  The invoices listed a "Net Amount" that reflected the total amount due to tronc, which Metro was to pay or turn over to tronc.  See Exh. C.

6.      On or around March 28, 2017, tronc received notice of Metro's bankruptcy filing and the financial difficulties Metro was facing.  Shortly thereafter, and on numerous occasions, tronc was informed by Metro and other agencies that, due to the bankruptcy filing, many of the advertisers that used Metro for advertising agency services—including many of the Clients— were leaving Metro for other advertising agencies.

3

7.      On April 6, 2017, tronc was informed by a Metro representative that it was closing its doors.   Thereafter, in a good faith effort to collect the millions of dollars in uncollected balances owed to it by the Clients, tronc mailed out letters to the Clients for the advertisements that tronc published on the Clients' behalf (the "Letters").   The Letters, dated April 6 and 7, 2017, inter alia, state that the respective Client owes a balance to tronc for services tronc rendered to and for the benefit of the Client.   The Letters acknowledge Metro's bankruptcy filing but made it clear that tronc was not attempting to collect any debt owed to Metro.   A representative Letter is attached to the Hausmann Declaration as **Exhibit D**.

8.      The Letters do not reference or request the collection of any amounts other than those due directly to tronc for its publications.   See Exh. D.   The invoices provided with the Letters exclude any commissions due or owing to Metro or any other agency.   See Exh. D.

9.      Even though tronc did not issue invoices directly to the Clients prior to the Letters, tronc always maintained that the advertisers and Metro were jointly and severally liable to pay for the publications which is consistent with tronc's Standard Terms and Conditions, as published on tronc's website, which state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."   See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** E to the Hausmann Declaration.

10.      Upon receiving word of the Letters' distribution, counsel for Metro threatened tronc's counsel and demanded that tronc cease and desist tronc's lawful collection activities and asserted that tronc is in violation of the automatic stay.   tronc's counsel responded and explained to Metro's counsel, inter alia, that tronc sought only to collect funds owed directly to tronc by the Clients for tronc's services.   See April 12, 2017 correspondence, attached to the Motion as

4

Exhibit B.  Metro's counsel offered no explanation for his theory that the stay extended to non-debtor parties, but instead filed the Motion on April 18, 2017.

## PROCEDURAL ISSUES

**A.**     *No Grounds Exist for Metro's Filing of its Motion on an Emergency Basis.*

11.     As an initial matter, Metro inappropriately and unnecessarily filed its Motion on an emergency basis, depriving tronc of a fair opportunity to prepare to address Metro's fabricated allegations.[2]

12.     tronc's lawful actions have not and will not interfere with Metro's ability to collect any amounts due and owing to Metro from any Client.  No immediate harm is imminent to justify the denial of tronc's rights to sufficient notice and due process.  As is obvious from the face of the Letters, tronc seeks only to recover what is owed directly to tronc from parties who are not in bankruptcy (or before the court).  Metro is not currently operating.  Despite Metro's assertions, it is chronologically impossible that tronc's Letters to the Clients was the catalyst for Metro's inevitable demise.  tronc did not send the Letters to the Clients until after Metro's representative informed tronc that Metro was closing its doors.  See Hausmann Declaration, ¶ 13-14.  tronc's actions pose no threat of harm (immediate or otherwise) to Metro or its interests.  If the non-debtor Clients pay tronc directly, they may have a right of recoupment or offset, but that is a function of the agency relationships, not a violation of the stay.  See also 11 U.S.C. §553(a).  Metro can not use the automatic stay as a basis for being unjustly enriched by the advertising services furnished by tronc.  Accordingly, this Court should dismiss the Motion or, alternatively, reschedule the hearing until an appropriate time that allows for tronc's collection of all factual information and evidence relevant to the fabricated allegations in the Motion.

_____

[2] To the extent necessary, tronc generally denies Metro's allegations in the Motion.

**B.**    ***Metro's Motion Should Have Been Brought as an Adversary Proceeding.***

13.    Metro's Motion also must be denied because it should have been brought as an adversary proceeding.  Instead, Metro improperly raised its claims through the Motion as a contested matter.

14.    The significance of whether a dispute is to be resolved through an adversary proceeding or as a contested matter is rooted in the procedural rules applicable to each.  An adversary proceeding is governed by Part VII of the Federal Rules of Bankruptcy Procedure and is initiated by the filing of a complaint and service of a summons.  See Fed. R. Bankr. P. 7001. Conversely, a contested matter is initially governed by Rule 9014 and is commenced by the service of a motion.  See Fed. R. Bankr. P. 9014.

15.    Rule 7001 of the Federal Rules of Bankruptcy Procedure dictates when an adversary proceeding is required.  Rule 7001 states that, inter alia, proceedings to recover money or property or to obtain an injunction or other equitable relief are adversary proceedings.  Fed. R. Bankr. P. 7001.

16.    When a party seeks injunctive relief or damages for a violation of the automatic stay, that party must assert its claims through the process of an adversary proceeding.  See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005) (dismissing contested matter proceeding without prejudice because debtor's request for injunctive relief and punitive damages was the type of action that requires commencement of an adversary proceeding); In re McDonald, 265 B.R. 3, 10 (Bankr. D.Mass.2001) (stating that the broad language of Rule 7001(1) permits debtors to bring litigation to recover money for a violation of the automatic stay as an adversary proceeding, and even if the court was in error on this point, the court would be within its discretion under Rule 9014 to order that all the adversary rules in Part VII of the

6

bankruptcy rules would apply in this matter); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997) (holding that since proceedings seeking to remedy a claimed violation of the automatic stay almost always pursue money, property or injunctive relief, such matters are required to be brought as adversary proceedings); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994) (finding that action to collect punitive damages for violation of automatic stay should be brought by way of an adversary proceeding).[3]

17.      Metro's Motion seeks, inter alia, injunctive relief, compensatory damages, punitive damages, and attorneys' fees.  The primary relief sought in the Motion is a "cease and desist" injunction.  Claims for these types of relief are expressly identified in Rule 7001 as adversary proceedings, governed by the procedures set forth in Part VII of the Bankruptcy Rules of Civil Procedure.  Therefore, Metro should have raised this matter by filing a complaint with the Court and serving tronc properly with a summons.  The failure to do so must result in the dismissal of the contested matter. See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005); In re McDonald, 265 B.R. 3 (Bankr. D.Mass.2001); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994).

18.      Even if this Court holds that Metro was correct to request injunctive relief, damages, and attorney's fees through its Motion, Metro failed to properly serve the Motion under Rule 9014.  Rule 9014(b) states that "[t]he motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule

---

[3] tronc notes for this Court that case law does exist in which a court permitted a debtor to address purported violations of the automatic stay through the procedural process of a contested matter.  See, e.g., In re Hooker Investment, Inc., 116 B.R. 375, 378 (S.D.N.Y. Bankr. 1990).  Such case law is distinguishable as the immediate motion clearly and primarily seeks injunctive relief, and not simply damages related to purported automatic stay violations.  See id. (which allowed the debtor to bring as a contested matter a claim for relief in the form of a declaration of a stay violation and that such actions were void and expressly acknowledging that the debtor therein was not seeking any injunctive relief but rather, only an automatic stay violation and related damages).  Metro's submission of the allegations in its Motion is nothing but a thinly-veiled attempt to circumvent any perceived inconvenience (or lack of perceived leverage over tronc) Metro would face if it were to bring an adversary proceeding.

9006(d)."  Fed. R. Bankr. P. 9014.  Metro failed to properly serve its Motion in the manner required by Rule 9014.  Instead of serving tronc in the manner prescribed by the Rules, Metro improperly mailed a copy of the motion and notices of hearing to tronc's attorney.  tronc had not filed a proof of claim or entered any other appearance in the case, and Metro (or its counsel) never even asked tronc's counsel if she was authorized to accept service.  See Affidavits of Service, Doc. Nos. 25 and 27.  Accordingly, Metro's Motion should be dismissed.[4]

## LEGAL ARGUMENT

### A.    *Metro's Relationships With the Clients Were Those of Agent and Principal.*

19.    Metro's relationships with the Clients were that of agent and principal.  As such, the principal Clients are independently liable to tronc for the amounts owed and Metro's Motion must be denied as the disclosed principal and also for unjust enrichment.

20.    As an initial matter, Metro's Motion assumes that New York state law on agency applies to the issues at hand.  This is not necessarily true.  First, tronc's Standard Terms and Conditions state that "all matters arising out of or relating to this Agreement, [are] governed by, and construed in accordance with the substantive law (excluding choice of law provisions) of the state of the relevant publication. See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit E** to the Hausmann Declaration.

21.    In the case that this Court finds the choice of law provision to be inapplicable, the Court must apply New York choice-of law provisions.  See In re Enron Corp., 367 B.R. 384, 392 (Bankr. Ct. S.D.N.Y. 2007) ("The Court looks to choice-of law rules of New York to resolve any

---

[4] Metro also failed to comply with the minimum notice requirements for its purported service of the Motion, failed to obtain a scheduling order shortening notice, and failed to file an affidavit under Local Rule 9077 attesting to the emergency grounds supporting shortening notice.  tronc reserves all rights with respect to these procedural defalcations, but notes that it will be present in Court at the noticed return date and time of the Motion with witnesses present and available to testify should the Court decide to conduct an evidentiary hearing at that time.

conflict-of law questions.")  New York utilizes a "significant contacts" analysis in determining the appropriate state law to apply.  In re Worldcom, Inc., 361 B.R. 697 (Bankr. Ct. S.D.N.Y. 2007) ("New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.") (internal quotations omitted).

22.      In the matter at hand, there are numerous states that have contacts with the facts at issue.  The respective Clients are located in cities throughout the country and the advertisements were published in no less than seven states.  None of the ads at issue were published in New York.  The largest amount of Client advertisements for which tronc has not received payment were placed in Illinois and California.  tronc is headquartered in Illinois and incorporated in Delaware.  Upon information and belief, Metro is a New York corporation with a principal place of business in New York.[5]  Because Metro failed to appropriately analyze and set forth the proper choice-of-law considerations and instead assumes that New York state law applies, tronc

---

[5] As stated in the Declaration of Phyllis Cavaliere Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtor's Chapter 11 Petition, however, the Debtor also maintained offices in, inter alia, Chicago and San Francisco before those offices were closed as part of the Debtor's "cost cutting" measures.  See Doc. No. 2, ¶11.

9

responds to Metro's arguments under New York state law, but reserves the right to object to the

application of New York law to this analysis.[6]

23.    Generally, in New York, the existence of an agency relationship is determined in

light of the facts and circumstances of each case.  Matter of Dean L Burdick Associates, Inc., 19

B.R. 813, 813-14 (Bankr. S.D.N.Y. 1982).    An agency relationship may be established "by

evidence of the consent of one person to allow another to act on his or her behalf and subject to

his or her control, and consent by the other so to act … The agent is a party who acts on behalf of

the principal with the latter's express, implied or apparent authority."  Time Warner City Cable

v. Adelphi University, 27 A.D.3d 551, 552 (N.Y. App. Div. 2006) (internal quotation omitted).

The relationships between Metro and the Clients fit squarely into the category of agent and

principal and, thus, under New York law, primary liability falls to the Clients for the amounts

owed to tronc.

24.    Metro's Motion misstates New York law on agency in relation to advertising

agencies and advertisers for print media.  Contrary to Metro's assertions, this Court has held that

relationships like those between Metro and the Clients are those of agent and principal.    In

Matter of Dean L Burdick Associates, Inc., this Court, by the Honorable Edward J. Ryan, found

an agency relationship between advertising agency and advertiser. 19 B.R. at 814-15.    In

Burdick, this Court explains that print media is a separate industry from television and radio,

---

[6] If the Court determines California or Illinois law applies to this proceeding, this Court should likewise find that an
agency relationship exists and deny Metro's Motion.  See In re Hall & Levine Advertising, Inc., 894 F.2d 1344
(C.D. Cal. 1990) (finding that an advertising agency was an agent of the advertiser, citing the agreement between the
agency and advertiser and the agency's disclosure of the advertiser as its principal); Store of Happiness v. Carmona
& Allen, Inc., 152 Cal.App.2d 266 (Cal. Dist. Ct. App. 1957) (holding that the evidence proved existence of agency
relationship, citing provisions of the contract between the advertising agency and the advertiser as well as the fact
that the agency sold no goods or other tangibles to sell, nor did it own television time other than that procured for the
advertiser.); U.S.C.C. Mgmt. Co. v. Ogden Allied Sec. Servs., Inc., No. 90 C 1389, 1991 WL 274445, at *3 (N.D.
Ill. Dec. 13, 1991) (holding that whether an agency relationship exists is a mixed question of fact and law that
depends upon the practices of the parties, including the "matter of hiring, direction of servants, the right to terminate
the relationship, and the character of supervision of the work done.")

with its own "customs and usages," and states that a publication media is entitled to assume that an advertising agency is seeking space on behalf of a principal. Id. at 815.  In coming to its determination, the Court relies upon Clarke v. Watt, a New York state court case.  The Court in Clarke v. Watt finds that an advertiser, having received full benefit of the advertising, could not escape payment and deprive the newspaper from fees. 145 N.Y.S. 145 (N.Y. App. Term 1913).

25.     Debtor asserts that there is no agency relationship between it and the Clients, arguing that New York law supports this proposition without addressing the contrary New York authority in the print media industry or even acknowledging or addressing the basic tenant under New York law that "[w]here the identity of the principal is disclosed, there is a presumption that credit is extended only to the principal and not to the agent" and that "[p]ayment alone does not explain…credit arrangements."  New York Times v. Glynn-Palmer Associates, Inc., 138 Misc.2d 862, 865 (N.Y. Civ. Ct. 1988); see also American Diabetes Ass'n v. Abbey, Mecca & Co., Inc., 77 A.D.3d 1333-34 (N.Y. App. Div. 2010) (finding that advertising agency acted as agent for clients even where insertion orders placed did not disclose client name on orders where publisher was aware of the client and the insertion orders contained no language suggesting that an agency relationship did not exist).

26.     It is clear from the facts and circumstances in the matter at hand that an agency relationship did exist between Metro and the Clients.  For each advertisement, Metro forwarded to tronc an Insert Order identifying the respective Client as well as the specifics of the advertisement to be placed.  Following publication, tronc issued invoices setting forth the net amount owed by the Client to tronc.  Moreover, industry norms and customs require that an agency relationship be assumed, unless the facts show otherwise.  Metro has set forth no

11

evidence that the parties involved intended to contract around the agency dynamic. To the contrary, Metro clearly was acting in its capacity as an agent for its principals, the Clients.

27.     The ultimate liability for the amounts outstanding to tronc for its services rests squarely with each respective Client and tronc's actions in pursing the debts were proper and lawful.

28.     The case law cited by Metro does not contradict the findings in the above cases or support the argument that Metro was not acting as the Clients' agent. Of the three cases cited, Metro relies most heavily on CBS, Inc. v. Stokely-Van Camp, Inc. to support Metro's argument that Metro was not acting as an agent for the Clients. However, as discussed above, in analyzing a factual scenario in print media, as opposed to television and radio, this Court in Burdick distinguishes CBS and finds an agency relationship between the advertising agency and the advertising client. See Burdick, 19 B.R. at 814-15.

29.     Moreover, in Fairchild Publications Division of Capital Cities Media, Inc. v. Rosston, Kremer & Slawter, Inc., 584 N.Y.S.2d 389 (N.Y. Sup. Ct. 1992) the Court states that it is actually undisputed that an agency relationship existed between an advertising agency and advertiser, but that the media company successfully proved that the advertiser should be nonetheless held liable for debts owed by showing that: (1) the advertising agency agreed to be liable for the debts of the advertising company and (2) custom and usage rendered the advertising agency liable. The facts in this instance will show that both the advertisers and Metro are liable for outstanding obligations due and owing to tronc. Here, the relationship between the parties as well as the custom and usage[7] establish that both Metro as agent and the

---

[7] As the court in Burdick specifically finds, in the print media publishing industry, custom and usage indicate an agency relationship. See Burdick, 19 B.R. at 814-15.

Client as principal were co-obligors on the tronc obligations and certainly never contemplated or established that the liability to tronc was solely Metro's.

30.     Likewise, in <u>Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island</u>, 59 Misc.2d 268 (N.Y. Dist. Ct. 1969) the Court assumes that a de facto agency relationship exists, but finds that the particular circumstances of that case result in financial liability of the agent instead of the principal.  Ultimately, the court finds that the terms in the insert orders sent by the advertising agency to the media company constituted contractual agreements, which specifically excluded recovery by the media entity from the advertising party.  <u>Id.</u> at 270-71.  The Insert Orders that Metro forwarded to tronc include no provision excluding recovery or collection from the Clients and, thus, the analysis in <u>Huntington</u> is inapplicable to the issues at hand.

### B.     *Metro's Motion Misconstrues the Automatic Stay Protections*

31.     Beyond Metro's incorrect characterization of the facts and New York agency law, Metro also grossly misconstrues the application of the automatic stay under Section 362(a)(3) of the Bankruptcy Code when it argues for the purported voidabilty of any payments made to tronc by the Clients that received and benefitted from the services provided by tronc, and that are directly and independently liable to tronc for such services.[8]

32.     If this Court were to follow Metro's logic and reasoning, the practical effect would be that the bankruptcy of an agent relieves the principal of liability to a third party.  No aspect of bankruptcy permits or sanctions that result.  Indeed, the Bankruptcy Code says precisely the opposite.  Section 524(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity on, or the property of any other entity for, such debt.**"  11 U.S.C. § 524(e) (emphasis added).

---

[8] tronc's standard terms and conditions, as published on tronc's website, are consistent with tronc's position in this Response and state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."  http://www.tribpub.com/ad-io-terms/  <u>See</u> Exh. E.

33.     Nothing in section 362 changes the general rule enunciated in section 524(e), nor does it prohibit a party from enforcing its rights against a non-debtor, even if that non-debtor is a co-obligor with a debtor.

34.     As is obvious from the face of the Letters, tronc is in no way pursuing any assets or property of Metro or its estate.  tronc is not seeking to collect any receivable due and owing to Metro or any other party.  Rather, tronc is seeking to collect debts from non-debtors who are directly liable for, and received the benefit of, the services provided by tronc.  The invoices enclosed with the Letters clearly demonstrate that tronc is only collecting from the Clients the value of the advertising services provided by tronc.  Metro did not provide any of those published advertising services.

35.     Even though Metro and the Clients are jointly liable to tronc for the amounts owed, the automatic stay applies to proceedings against a debtor and does not apply to any other entity.   The automatic stay does not apply to nonbankrupt co-defendants or co-obligors and is not intended to give an unwarranted immunity from suit to solvent co-debtors, which itself would "contravene the purposes underlying the automatic stay."  See, e.g. CAE Industries Ltd. v. Aerospace Holdings, Co., 116 B.R. 31 (S.D.N.Y. 1990); see also In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996) ("As a general proposition, the automatic stay is limited to the debtor, and does not apply to actions against non-debtor third parties."); In re Wolf Fin. Grp., Inc., No. 94-8884A, 1994 WL 913278, at *6 (Bankr. S.D.N.Y. Dec. 15, 1994) ("The stay should not be extended to protect non-debtors from their own wrongdoing.").  Accordingly, Metro significantly mischaracterizes the scope of the automatic stay and the purported impropriety of tronc's actions.

14

36.     The mere fact that if the principal satisfies its obligation it may give rise to a right of recoupment or offset against the agent's claim to collect the pass through of the same amount does not create an automatic stay issue.  That is simply a function of the joint and several liability.  The Bankruptcy Code expressly preserves offset rights in Section 553(a).  Metro is attempting to turn the bankruptcy laws on their head by using the stay as a rationale for unjustly enriching itself by keeping the benefit of the advertising services provided solely by tronc.

37.     Further clarifying the scope of the automatic stay in this instance is the purposeful omission of any relevant statutory guidance requiring an extension of the automatic stay to co-debtors.  Unlike other types of bankruptcy proceedings, a provision requiring a stay of action against co-debtors is omitted from the Chapter 11 provisions of the Bankruptcy Code. Conversely, 11 U.S.C. § 1301 explicitly sets forth a requirement that in Chapter 13 proceedings a creditor may not act to collect on a debt from an individual that is liable on such debt with a debtor.  Clearly, if Congress intended to extend the automatic stay in Chapter 11 proceedings to co-obligors, co-debtors, or principals, it would have expressly set forth such a requirement akin to that articulated in 11 U.S.C. §1301.  Metro attempts to create a parallel rule where none exists.

15

WHEREFORE, in consideration of the foregoing, tronc, Inc. respectfully requests that this Court enter an order dismissing Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice, and grant tronc, Inc. such relief, including costs and attorneys' fees, as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Tracy L. Klestadt*
Tracy L. Klestadt
KLESTADT WINTERS JURELLER SOUTHARD
& STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
Helen S. Ward, Esq. (*pro hac vice pending*)

DATE:  April 27, 2017                    Attorneys for tronc, Inc.
2465598.v1

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

In re:                                                     Chapter 11

METRO NEWSPAPER ADVERTISING                  Case No. 17-22445 (RDD)
SERVICES, INC.,

        Debtor.

-------------------------------------------------------------X


## <u>CERTIFICATE OF SERVICE</u>

     The undersigned attorney does hereby certify that a true and correct copy of the foregoing

was filed electronically on this 27th day of April, 2017 and accordingly was served upon all

parties currently registered to receive notice via this Court's ECF notification system.




                               */s/ Tracy L. Klestadt*

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000
Tracy L. Klestadt
TKlestadt@Klestadt.com

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
wkelleher@cohenlaw.com
Helen S. Ward, Esq. (*pro hac vice pending*)
hward@cohenlaw.com

*Attorneys for tronc, Inc.*

**Hearing Date:  April 28, 2017**
**Hearing Time: 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

In re:                                             Chapter 11

METRO NEWSPAPER ADVERTISING                        Case No. 17-22445 (RDD)
SERVICES, INC.,

        Debtor.

-----------------------------------------------------------X


**RESPONSE IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR AN
ORDER (i) DETERMINING TRONC, INC. TO BE IN WILLFUL VIOLATION OF THE
AUTOMATIC STAY AND (ii) DIRECTING TRONC, INC. TO PAY THE DEBTOR'S
COSTS AND FEES INCURRED AND COMPENSATORY DAMAGES SUSTAINED IN
CONNECTION WITH THIS MOTION PURSUANT TO THIS COURT'S CIVIL
CONTEMPT POWERS AND 11 U.S.C. §§ 105(a) and 362(a) AND REQUEST FOR
<u>HEARING ON SHORTENED NOTICE</u>**

TO:    **THE HONORABLE ROBERT D. DRAIN**
       **UNITED STATES BANKRUPTCY JUDGE**

tronc, Inc. ("tronc"), by and through its counsel, hereby responds and objects to Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice (the "Motion"), without consenting to jurisdiction or waiving its jurisdictional objections, as follows:

## FACTUAL BACKGROUND

1.    tronc is a newspaper print and online media publishing company with its principal place of business in Chicago, Illinois.  Originally a division of the Tribune Publishing Company, tronc spun off into a separate entity in 2014, at which point it adopted the name "tronc" (which is short for Tribune online content).  tronc's publications include the Chicago Tribune, Los Angeles Times, San Diego Union Times, Orlando Sentinel, Baltimore Sun, and others.

2.    tronc deals with many agencies that order ads in tronc's publications on behalf of advertisers. Metro served as the advertising agency for numerous advertisers, including the approximately 19 advertisers[1] (the "Clients") whose accounts are at issue in this matter.  The Clients utilized Metro's services as an advertising agency to place advertisements in tronc's newsprint and online publications.

---

[1] While Metro was in fact the agent for other advertisers who placed certain orders with tronc, the advertisers with the largest, outstanding obligation to tronc are as follows: AARP, AB Data Limited, ADT, Blue Shield of CA, Boehringer (LAT), Burger King Corporation, Capital One (CTC), Centene Corp dba Health Net, Dignity Health, Eau Palm Beach Spa, HSBC Bank, Incyte Pharmaceuticals, LG Electronics, Mutual of Omaha, Navy Federal Credit Union, Pentagon Federal, PNC Bank, Sands Bethlehem, and Siemens.

3.      The Clients' procurement of advertising space in tronc's news publications often took place by the Clients contacting tronc through Metro for ad placement.  Metro would often forward to tronc an "Insert Order," on behalf of the Client which specified (1) the advertisement tronc was to publish or insert, (2) the Client's identity, (3) any specific instructions for publication, (4) the commissions due any agencies for agent services ordered (including Metro's), and (5) the total due tronc for the advertisement.  A representative Insert Order is attached as **Exhibit A** to the Declaration of Richard Hausmann in Support of tronc's Response filed contemporaneously herewith ("Hausmann Declaration").  The Insert Order would reflect the commissions to Metro or the other agencies payable by the Client (not tronc).

4.      Frequently, subsequent Change Orders would include changes or other specific information and expressly state and request that tronc "please change the advertising of [Client]." A representative Change Order is attached to the Hausmann Declaration as **Exhibit B**.

5.      Historically, tronc would then place the advertisement in the publication that the Client had selected.  After the advertisement ran, tronc would send Metro an invoice specifying the net amount due and owing to tronc from the Client.  A representative Invoice is attached hereto at **Exhibit C** to the Hausmann Declaration.  The invoices listed a "Net Amount" that reflected the total amount due to tronc, which Metro was to pay or turn over to tronc.  See Exh. C.

6.      On or around March 28, 2017, tronc received notice of Metro's bankruptcy filing and the financial difficulties Metro was facing.  Shortly thereafter, and on numerous occasions, tronc was informed by Metro and other agencies that, due to the bankruptcy filing, many of the advertisers that used Metro for advertising agency services—including many of the Clients— were leaving Metro for other advertising agencies.

3

7.     On April 6, 2017, tronc was informed by a Metro representative that it was closing its doors.   Thereafter, in a good faith effort to collect the millions of dollars in uncollected balances owed to it by the Clients, tronc mailed out letters to the Clients for the advertisements that tronc published on the Clients' behalf (the "Letters").   The Letters, dated April 6 and 7, 2017, inter alia, state that the respective Client owes a balance to tronc for services tronc rendered to and for the benefit of the Client.   The Letters acknowledge Metro's bankruptcy filing but made it clear that tronc was not attempting to collect any debt owed to Metro.   A representative Letter is attached to the Hausmann Declaration as **Exhibit D**.

8.     The Letters do not reference or request the collection of any amounts other than those due directly to tronc for its publications.   See Exh. D.   The invoices provided with the Letters exclude any commissions due or owing to Metro or any other agency.   See Exh. D.

9.     Even though tronc did not issue invoices directly to the Clients prior to the Letters, tronc always maintained that the advertisers and Metro were jointly and severally liable to pay for the publications which is consistent with tronc's Standard Terms and Conditions, as published on tronc's website, which state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."   See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit** E to the Hausmann Declaration.

10.     Upon receiving word of the Letters' distribution, counsel for Metro threatened tronc's counsel and demanded that tronc cease and desist tronc's lawful collection activities and asserted that tronc is in violation of the automatic stay.   tronc's counsel responded and explained to Metro's counsel, inter alia, that tronc sought only to collect funds owed directly to tronc by the Clients for tronc's services.   See April 12, 2017 correspondence, attached to the Motion as

4

Exhibit B.  Metro's counsel offered no explanation for his theory that the stay extended to non-debtor parties, but instead filed the Motion on April 18, 2017.

## PROCEDURAL ISSUES

### A.    *No Grounds Exist for Metro's Filing of its Motion on an Emergency Basis.*

11.     As an initial matter, Metro inappropriately and unnecessarily filed its Motion on an emergency basis, depriving tronc of a fair opportunity to prepare to address Metro's fabricated allegations.[2]

12.     tronc's lawful actions have not and will not interfere with Metro's ability to collect any amounts due and owing to Metro from any Client.  No immediate harm is imminent to justify the denial of tronc's rights to sufficient notice and due process.  As is obvious from the face of the Letters, tronc seeks only to recover what is owed directly to tronc from parties who are not in bankruptcy (or before the court).  Metro is not currently operating.  Despite Metro's assertions, it is chronologically impossible that tronc's Letters to the Clients was the catalyst for Metro's inevitable demise.  tronc did not send the Letters to the Clients until after Metro's representative informed tronc that Metro was closing its doors.  See Hausmann Declaration, ¶ 13-14.  tronc's actions pose no threat of harm (immediate or otherwise) to Metro or its interests.  If the non-debtor Clients pay tronc directly, they may have a right of recoupment or offset, but that is a function of the agency relationships, not a violation of the stay.  See also 11 U.S.C. §553(a).  Metro can not use the automatic stay as a basis for being unjustly enriched by the advertising services furnished by tronc.  Accordingly, this Court should dismiss the Motion or, alternatively, reschedule the hearing until an appropriate time that allows for tronc's collection of all factual information and evidence relevant to the fabricated allegations in the Motion.

---

[2] To the extent necessary, tronc generally denies Metro's allegations in the Motion.

### B.    *Metro's Motion Should Have Been Brought as an Adversary Proceeding.*

13.    Metro's Motion also must be denied because it should have been brought as an adversary proceeding.  Instead, Metro improperly raised its claims through the Motion as a contested matter.

14.    The significance of whether a dispute is to be resolved through an adversary proceeding or as a contested matter is rooted in the procedural rules applicable to each.  An adversary proceeding is governed by Part VII of the Federal Rules of Bankruptcy Procedure and is initiated by the filing of a complaint and service of a summons.  See Fed. R. Bankr. P. 7001.  Conversely, a contested matter is initially governed by Rule 9014 and is commenced by the service of a motion.  See Fed. R. Bankr. P. 9014.

15.    Rule 7001 of the Federal Rules of Bankruptcy Procedure dictates when an adversary proceeding is required.  Rule 7001 states that, inter alia, proceedings to recover money or property or to obtain an injunction or other equitable relief are adversary proceedings.  Fed. R. Bankr. P. 7001.

16.    When a party seeks injunctive relief or damages for a violation of the automatic stay, that party must assert its claims through the process of an adversary proceeding.  See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005) (dismissing contested matter proceeding without prejudice because debtor's request for injunctive relief and punitive damages was the type of action that requires commencement of an adversary proceeding); In re McDonald, 265 B.R. 3, 10 (Bankr. D.Mass.2001) (stating that the broad language of Rule 7001(1) permits debtors to bring litigation to recover money for a violation of the automatic stay as an adversary proceeding, and even if the court was in error on this point, the court would be within its discretion under Rule 9014 to order that all the adversary rules in Part VII of the

6

bankruptcy rules would apply in this matter); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997) (holding that since proceedings seeking to remedy a claimed violation of the automatic stay almost always pursue money, property or injunctive relief, such matters are required to be brought as adversary proceedings); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994) (finding that action to collect punitive damages for violation of automatic stay should be brought by way of an adversary proceeding).[3]

17.    Metro's Motion seeks, inter alia, injunctive relief, compensatory damages, punitive damages, and attorneys' fees.  The primary relief sought in the Motion is a "cease and desist" injunction.  Claims for these types of relief are expressly identified in Rule 7001 as adversary proceedings, governed by the procedures set forth in Part VII of the Bankruptcy Rules of Civil Procedure.  Therefore, Metro should have raised this matter by filing a complaint with the Court and serving tronc properly with a summons.  The failure to do so must result in the dismissal of the contested matter. See, e.g., In re Irby, 321 B.R. 468, 470–71 (Bankr. N.D.Ohio 2005); In re McDonald, 265 B.R. 3 (Bankr. D.Mass.2001); Matter of Rimsat, Ltd., 208 B.R. 910, 913 (Bankr. N.D.Ind.1997); In re Wyatt, 173 B.R. 698, 704 (Bankr. D.Idaho 1994).

18.    Even if this Court holds that Metro was correct to request injunctive relief, damages, and attorney's fees through its Motion, Metro failed to properly serve the Motion under Rule 9014.  Rule 9014(b) states that "[t]he motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule

---

[3] tronc notes for this Court that case law does exist in which a court permitted a debtor to address purported violations of the automatic stay through the procedural process of a contested matter.  See, e.g., In re Hooker Investment, Inc., 116 B.R. 375, 378 (S.D.N.Y. Bankr. 1990).  Such case law is distinguishable as the immediate motion clearly and primarily seeks injunctive relief, and not simply damages related to purported automatic stay violations.  See id. (which allowed the debtor to bring as a contested matter a claim for relief in the form of a declaration of a stay violation and that such actions were void and expressly acknowledging that the debtor therein was not seeking any injunctive relief but rather, only an automatic stay violation and related damages).  Metro's submission of the allegations in its Motion is nothing but a thinly-veiled attempt to circumvent any perceived inconvenience (or lack of perceived leverage over tronc) Metro would face if it were to bring an adversary proceeding.

9006(d)." Fed. R. Bankr. P. 9014. Metro failed to properly serve its Motion in the manner required by Rule 9014. Instead of serving tronc in the manner prescribed by the Rules, Metro improperly mailed a copy of the motion and notices of hearing to tronc's attorney. tronc had not filed a proof of claim or entered any other appearance in the case, and Metro (or its counsel) never even asked tronc's counsel if she was authorized to accept service. See Affidavits of Service, Doc. Nos. 25 and 27. Accordingly, Metro's Motion should be dismissed.[4]

## LEGAL ARGUMENT

### A.    *Metro's Relationships With the Clients Were Those of Agent and Principal.*

19.    Metro's relationships with the Clients were that of agent and principal. As such, the principal Clients are independently liable to tronc for the amounts owed and Metro's Motion must be denied as the disclosed principal and also for unjust enrichment.

20.    As an initial matter, Metro's Motion assumes that New York state law on agency applies to the issues at hand. This is not necessarily true. First, tronc's Standard Terms and Conditions state that "all matters arising out of or relating to this Agreement, [are] governed by, and construed in accordance with the substantive law (excluding choice of law provisions) of the state of the relevant publication. See Advertising Agreement Standard Terms and Conditions for Placement of Print, Digital and Preprint Ads, attached hereto as **Exhibit E** to the Hausmann Declaration.

21.    In the case that this Court finds the choice of law provision to be inapplicable, the Court must apply New York choice-of law provisions. See In re Enron Corp., 367 B.R. 384, 392 (Bankr. Ct. S.D.N.Y. 2007) ("The Court looks to choice-of law rules of New York to resolve any

---

[4] Metro also failed to comply with the minimum notice requirements for its purported service of the Motion, failed to obtain a scheduling order shortening notice, and failed to file an affidavit under Local Rule 9077 attesting to the emergency grounds supporting shortening notice. tronc reserves all rights with respect to these procedural defalcations, but notes that it will be present in Court at the noticed return date and time of the Motion with witnesses present and available to testify should the Court decide to conduct an evidentiary hearing at that time.

conflict-of law questions.")  New York utilizes a "significant contacts" analysis in determining the appropriate state law to apply.  In re Worldcom, Inc., 361 B.R. 697 (Bankr. Ct. S.D.N.Y. 2007) ("New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.") (internal quotations omitted).

22.      In the matter at hand, there are numerous states that have contacts with the facts at issue.  The respective Clients are located in cities throughout the country and the advertisements were published in no less than seven states.  None of the ads at issue were published in New York.  The largest amount of Client advertisements for which tronc has not received payment were placed in Illinois and California.  tronc is headquartered in Illinois and incorporated in Delaware.  Upon information and belief, Metro is a New York corporation with a principal place of business in New York.[5]  Because Metro failed to appropriately analyze and set forth the proper choice-of-law considerations and instead assumes that New York state law applies, tronc

---

[5] As stated in the Declaration of Phyllis Cavaliere Pursuant to Local Bankruptcy Rule 1007-2 in Support of Debtor's Chapter 11 Petition, however, the Debtor also maintained offices in, inter alia, Chicago and San Francisco before those offices were closed as part of the Debtor's "cost cutting" measures.  See Doc. No. 2, ¶11.

responds to Metro's arguments under New York state law, but reserves the right to object to the application of New York law to this analysis.[6]

23.    Generally, in New York, the existence of an agency relationship is determined in light of the facts and circumstances of each case.  Matter of Dean L Burdick Associates, Inc., 19 B.R. 813, 813-14 (Bankr. S.D.N.Y. 1982).  An agency relationship may be established "by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act … The agent is a party who acts on behalf of the principal with the latter's express, implied or apparent authority."  Time Warner City Cable v. Adelphi University, 27 A.D.3d 551, 552 (N.Y. App. Div. 2006) (internal quotation omitted).  The relationships between Metro and the Clients fit squarely into the category of agent and principal and, thus, under New York law, primary liability falls to the Clients for the amounts owed to tronc.

24.    Metro's Motion misstates New York law on agency in relation to advertising agencies and advertisers for print media.  Contrary to Metro's assertions, this Court has held that relationships like those between Metro and the Clients are those of agent and principal.  In Matter of Dean L Burdick Associates, Inc., this Court, by the Honorable Edward J. Ryan, found an agency relationship between advertising agency and advertiser. 19 B.R. at 814-15.  In Burdick, this Court explains that print media is a separate industry from television and radio,

---

[6] If the Court determines California or Illinois law applies to this proceeding, this Court should likewise find that an agency relationship exists and deny Metro's Motion.  See In re Hall & Levine Advertising, Inc., 894 F.2d 1344 (C.D. Cal. 1990) (finding that an advertising agency was an agent of the advertiser, citing the agreement between the agency and advertiser and the agency's disclosure of the advertiser as its principal); Store of Happiness v. Carmona & Allen, Inc., 152 Cal.App.2d 266 (Cal. Dist. Ct. App. 1957) (holding that the evidence proved existence of agency relationship, citing provisions of the contract between the advertising agency and the advertiser as well as the fact that the agency sold no goods or other tangibles to sell, nor did it own television time other than that procured for the advertiser.); U.S.C.C. Mgmt. Co. v. Ogden Allied Sec. Servs., Inc., No. 90 C 1389, 1991 WL 274445, at *3 (N.D. Ill. Dec. 13, 1991) (holding that whether an agency relationship exists is a mixed question of fact and law that depends upon the practices of the parties, including the "matter of hiring, direction of servants, the right to terminate the relationship, and the character of supervision of the work done.")

with its own "customs and usages," and states that a publication media is entitled to assume that an advertising agency is seeking space on behalf of a principal. Id. at 815. In coming to its determination, the Court relies upon Clarke v. Watt, a New York state court case. The Court in Clarke v. Watt finds that an advertiser, having received full benefit of the advertising, could not escape payment and deprive the newspaper from fees. 145 N.Y.S. 145 (N.Y. App. Term 1913).

25.     Debtor asserts that there is no agency relationship between it and the Clients, arguing that New York law supports this proposition without addressing the contrary New York authority in the print media industry or even acknowledging or addressing the basic tenant under New York law that "[w]here the identity of the principal is disclosed, there is a presumption that credit is extended only to the principal and not to the agent" and that "[p]ayment alone does not explain…credit arrangements."  New York Times v. Glynn-Palmer Associates, Inc., 138 Misc.2d 862, 865 (N.Y. Civ. Ct. 1988); see also American Diabetes Ass'n v. Abbey, Mecca & Co., Inc., 77 A.D.3d 1333-34 (N.Y. App. Div. 2010) (finding that advertising agency acted as agent for clients even where insertion orders placed did not disclose client name on orders where publisher was aware of the client and the insertion orders contained no language suggesting that an agency relationship did not exist).

26.     It is clear from the facts and circumstances in the matter at hand that an agency relationship did exist between Metro and the Clients.  For each advertisement, Metro forwarded to tronc an Insert Order identifying the respective Client as well as the specifics of the advertisement to be placed.  Following publication, tronc issued invoices setting forth the net amount owed by the Client to tronc.  Moreover, industry norms and customs require that an agency relationship be assumed, unless the facts show otherwise.  Metro has set forth no

11

evidence that the parties involved intended to contract around the agency dynamic. To the contrary, Metro clearly was acting in its capacity as an agent for its principals, the Clients.

27.    The ultimate liability for the amounts outstanding to tronc for its services rests squarely with each respective Client and tronc's actions in pursing the debts were proper and lawful.

28.    The case law cited by Metro does not contradict the findings in the above cases or support the argument that Metro was not acting as the Clients' agent. Of the three cases cited, Metro relies most heavily on CBS, Inc. v. Stokely-Van Camp, Inc. to support Metro's argument that Metro was not acting as an agent for the Clients. However, as discussed above, in analyzing a factual scenario in print media, as opposed to television and radio, this Court in Burdick distinguishes CBS and finds an agency relationship between the advertising agency and the advertising client. See Burdick, 19 B.R. at 814-15.

29.    Moreover, in Fairchild Publications Division of Capital Cities Media, Inc. v. Rosston, Kremer & Slawter, Inc., 584 N.Y.S.2d 389 (N.Y. Sup. Ct. 1992) the Court states that it is actually undisputed that an agency relationship existed between an advertising agency and advertiser, but that the media company successfully proved that the advertiser should be nonetheless held liable for debts owed by showing that: (1) the advertising agency agreed to be liable for the debts of the advertising company and (2) custom and usage rendered the advertising agency liable.    The facts in this instance will show that both the advertisers and Metro are liable for outstanding obligations due and owing to tronc. Here, the relationship between the parties as well as the custom and usage[7] establish that both Metro as agent and the

---

[7] As the court in Burdick specifically finds, in the print media publishing industry, custom and usage indicate an agency relationship. See Burdick, 19 B.R. at 814-15.

Client as principal were co-obligors on the tronc obligations and certainly never contemplated or established that the liability to tronc was solely Metro's.

30.     Likewise, in <u>Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island</u>, 59 Misc.2d 268 (N.Y. Dist. Ct. 1969) the Court assumes that a de facto agency relationship exists, but finds that the particular circumstances of that case result in financial liability of the agent instead of the principal.  Ultimately, the court finds that the terms in the insert orders sent by the advertising agency to the media company constituted contractual agreements, which specifically excluded recovery by the media entity from the advertising party.  <u>Id.</u> at 270-71.  The Insert Orders that Metro forwarded to tronc include no provision excluding recovery or collection from the Clients and, thus, the analysis in <u>Huntington</u> is inapplicable to the issues at hand.

### B.     *Metro's Motion Misconstrues the Automatic Stay Protections*

31.     Beyond Metro's incorrect characterization of the facts and New York agency law, Metro also grossly misconstrues the application of the automatic stay under Section 362(a)(3) of the Bankruptcy Code when it argues for the purported voidabilty of any payments made to tronc by the Clients that received and benefitted from the services provided by tronc, and that are directly and independently liable to tronc for such services.[8]

32.     If this Court were to follow Metro's logic and reasoning, the practical effect would be that the bankruptcy of an agent relieves the principal of liability to a third party.  No aspect of bankruptcy permits or sanctions that result.  Indeed, the Bankruptcy Code says precisely the opposite.  Section 524(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor **does not affect the liability of any other entity on, or the property of any other entity for, such debt.**"  11 U.S.C. § 524(e) (emphasis added).

---

[8] tronc's standard terms and conditions, as published on tronc's website, are consistent with tronc's position in this Response and state that the advertising agency and advertiser are "jointly and severally liable for the obligations of the other."  http://www.tribpub.com/ad-io-terms/  <u>See</u> Exh. E.

33.     Nothing in section 362 changes the general rule enunciated in section 524(e), nor does it prohibit a party from enforcing its rights against a non-debtor, even if that non-debtor is a co-obligor with a debtor.

34.     As is obvious from the face of the Letters, tronc is in no way pursuing any assets or property of Metro or its estate.  tronc is not seeking to collect any receivable due and owing to Metro or any other party.  Rather, tronc is seeking to collect debts from non-debtors who are directly liable for, and received the benefit of, the services provided by tronc.  The invoices enclosed with the Letters clearly demonstrate that tronc is only collecting from the Clients the value of the advertising services provided by tronc.  Metro did not provide any of those published advertising services.

35.     Even though Metro and the Clients are jointly liable to tronc for the amounts owed, the automatic stay applies to proceedings against a debtor and does not apply to any other entity.   The automatic stay does not apply to nonbankrupt co-defendants or co-obligors and is not intended to give an unwarranted immunity from suit to solvent co-debtors, which itself would "contravene the purposes underlying the automatic stay."  See, e.g. CAE Industries Ltd. v. Aerospace Holdings, Co., 116 B.R. 31 (S.D.N.Y. 1990); see also In re Bidermann Indus. U.S.A., Inc., 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996) ("As a general proposition, the automatic stay is limited to the debtor, and does not apply to actions against non-debtor third parties."); In re Wolf Fin. Grp., Inc., No. 94-8884A, 1994 WL 913278, at *6 (Bankr. S.D.N.Y. Dec. 15, 1994) ("The stay should not be extended to protect non-debtors from their own wrongdoing.").  Accordingly, Metro significantly mischaracterizes the scope of the automatic stay and the purported impropriety of tronc's actions.

14

36.    The mere fact that if the principal satisfies its obligation it may give rise to a right of recoupment or offset against the agent's claim to collect the pass through of the same amount does not create an automatic stay issue.    That is simply a function of the joint and several liability.    The Bankruptcy Code expressly preserves offset rights in Section 553(a).    Metro is attempting to turn the bankruptcy laws on their head by using the stay as a rationale for unjustly enriching itself by keeping the benefit of the advertising services provided solely by tronc.

37.    Further clarifying the scope of the automatic stay in this instance is the purposeful omission of any relevant statutory guidance requiring an extension of the automatic stay to co-debtors.    Unlike other types of bankruptcy proceedings, a provision requiring a stay of action against co-debtors is omitted from the Chapter 11 provisions of the Bankruptcy Code.    Conversely, 11 U.S.C. § 1301 explicitly sets forth a requirement that in Chapter 13 proceedings a creditor may not act to collect on a debt from an individual that is liable on such debt with a debtor.    Clearly, if Congress intended to extend the automatic stay in Chapter 11 proceedings to co-obligors, co-debtors, or principals, it would have expressly set forth such a requirement akin to that articulated in 11 U.S.C. §1301.    Metro attempts to create a parallel rule where none exists.

15

WHEREFORE, in consideration of the foregoing, tronc, Inc. respectfully requests that this Court enter an order dismissing Debtor's Emergency Motion For An Order (i) Determining Tronc, Inc. To Be In Willful Violation Of The Automatic Stay And (ii) Directing Tronc, Inc. To Pay The Debtor's Costs And Fees Incurred And Compensatory Damages Sustained In Connection With This Motion Pursuant To This Court's Civil Contempt Powers And 11 U.S.C. §§ 105(A) And 362(A) And Request For Hearing On Shortened Notice, and grant tronc, Inc. such relief, including costs and attorneys' fees, as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Tracy L. Klestadt*
Tracy L. Klestadt
KLESTADT WINTERS JURELLER SOUTHARD
& STEVENS, LLP
200 West 41st Street, 17th Floor
New York, NY  10036
(212) 972-3000

and

COHEN & GRIGSBY, P.C.
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
William E. Kelleher, Esq. (*pro hac vice pending*)
Helen S. Ward, Esq. (*pro hac vice pending*)

DATE:  April 27, 2017                    Attorneys for tronc, Inc.
2465598.v1

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

In re:                                          Chapter 11

METRO NEWSPAPER ADVERTISING                     Case No. 17-22445 (RDD)
SERVICES, INC.,

       Debtor.

-------------------------------------------------------------X


## CERTIFICATE OF SERVICE

       The undersigned attorney does hereby certify that a true and correct copy of the foregoing

was filed electronically on this 27th day of April, 2017 and accordingly was served upon all

parties currently registered to receive notice via this Court's ECF notification system.



       */s/ Tracy L. Klestadt*