UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

METRO NEWSPAPER ADVERTISING
SERVICES, INC.,

*Debtor.*

Case No. 17-22445-rdd
White Plains, New York
April 28, 2017
11:11 a.m. - 12:12 p.m.

- TRANSCRIPT -

17-22445-RDD - METRO NEWSPAPER ADVERTISING SERVICES, INC.
FINAL HEARING - (WAGES) MOTION TO AUTHORIZE PAYMENT OF PRE-
PETITION WAGES, ETC. [ECF NOS. 7, 17];
FINAL HEARING - (CASH COLLATERAL) MOTION FOR AUTHORITY TO
OBTAIN CREDIT IN THE FORM OF FACTORING ARRANGEMENT AND
TO SELL ACCOUNTS RECEIVABLE, AND MOTION TO APPROVE USE
OF CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION
THEREFORE [ECF NOS. 3, 16];
(#24) MOTION FOR DAMAGES FOR CREDITOR MISCONDUCT,
VIOLATION OF THE AUTOMATIC STAY AND REQUEST FOR SANCTIONS,
COMPENSATORY DAMAGES, ETC. AGAINST TRONC INC. FOR WILLFUL
VIOLATION OF AUTOMATIC STAY AND REQUEST FOR
EMERGENCY HEARING ON SHORTENED NOTICE [ECF NO. 24];
(#30) AFFIDAVIT DECLARATION OF HORIZON MEDIA, INC.
IN SUPPORT OF DEBTOR' S MOTION;
(#34) OPPOSITION ON BEHALF OF TRONC;
(#35) DECLARATION OF RICHARD HAUSMANN ON BEHALF OF TRONC.
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S :

| | |
|---|---|
| *For the Debtor:* | JONATHAN S. PASTERNAK, ESQ.<br>STEVEN R. SCHOENFELD, ESQ.<br>DelBello Donnellan Weingarten Wise<br>One North Lexington Avenue<br>White Plains, New York 10601<br>(914) 681-0200; (914) 684-0288 fax |
| *For tronc, Inc.:* | TRACY L. KLESTADT, ESQ.<br>Klestadt Winters Jureller Southard &<br>Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036-7203<br>(212) 679-8700; (212) 972-2245 fax<br>tklestadt@klestadt.com |

```
1   A P P E A R A N C E S :

2    For the U.S. Attorney:        SERENE K. NAKANO, ESQ.
     (via phone)                   U.S. Federal Office Building
3                                  201 Varick Street, Suite 1006
                                   New York, New York 10014
4                                  (212) 510-0505; (212) 668-2255 fax
                                   serene.k.nakano@usdoj.gov
5
     For tron, Inc.:               WILLIAM E. KELLEHER, JR., ESQ.
6                                  HELEN SARA WARD, ESQ.
                                   Cohen & Grigsby, PC
7                                  625 Liberty Avenue
                                   Pittsburgh, Pennsylvania 5222-3152
8                                  (412) 297-4900; (412) 209-0672 fax
9
     For Creditor's Committee:     MARY E. SEYMOUR, ESQ.
10                                 Lowenstein Sandler, PC
                                   65 Livingston Avenue
11                                 Roseland, New Jersey 07068-1791
                                   (973) 597-2376; (973) 597-2377 fax
12                                 mseymour@lowenstein.com

13   For Versant Funding:          MARK DAVID WEINBERG, ESQ.
     (via phone)                   Versant Funding, LLC
14                                 2500 N. Military Trail Suite 465
                                   Boca Raton, Florida 33431-6353
15                                 (561) 405-4100
                                   mweinberg@versantfunding.com
16
     For Group M. Worldwide:       MASSIMO GIUGLIANO, ESQ.
17   (via phone)                   Davis & Gilbert LLP
                                   1740 Broadway, #3
18                                 New York, New York 10019
                                   (212) 468-4800; (212) 468-4888 fax
19                                 mgiugliano@dglaw.com
20
     Transcriber:                  AA EXPRESS TRANSCRIPTS
21                                 195 Willoughby Avenue, Suite 1514
                                   Brooklyn, New York 11205
22                                 (888) 456-9716; (888) 677-6131 fax
                                   aaexpress@court-transcripts.net
23
          (Proceedings recorded by electronic sound recording)
24

25
```

1          THE COURT:  Okay.  In re Metro Newspaper Advertising

2     Services, Inc.

3          Okay.  There are a number of matters on this calendar

4     too.  Why don't we first deal with the final hearings on the

5     motions where, in my absence, Judge Lane granted interim relief

6     earlier in the month?

7          MR. PASTERNAK:  Would you like appearances first, Your

8     Honor, from everyone?

9          THE COURT:  Sure.

10          MR. PASTERNAK:  Okay.

11          THE COURT:  Since this is my first hearing.

12          MR. PASTERNAK:  Yes, I'd like to introduce our clients

13     here, Your Honor.

14          THE COURT:  Okay.

15          MR. PASTERNAK:  Good morning, Your Honor, Jonathan

16     Pasternak, DelBello Donnellan & Weingarten, for the Debtor.  To

17     my left, Your Honor, is Phyllis Cavaliere, she is the Chief

18     Executive Officer of the Debtor.  And to her left is Michael

19     Baratoff.  He is the President of the Debtor.

20          THE COURT:  Okay.  Good morning.

21          MR. PASTERNAK:  And to their left is my colleague,

22     Steve Schoenfeld.

23          THE COURT:  All right.  Good morning.

24          MR. SCHOENFELD:  Good morning.

25          MS. SEYMOUR:  Good morning, Your Honor, Mary Seymour,

Metro Newspaper Advertising Services - 4/28/17                4

1    Lowenstein Sandler.  We are proposed counsel to the official

2    committee of unsecured creditors.

3              THE COURT:  Okay.

4              MR. KLESTADT: Good morning, Your Honor, Tracy

5    Klestadt, of Klestadt Winters Jureller Southard & Stevens, co-

6    counsel for tronc, Inc.  And if I may introduce to the Court,

7    William Kelleher and Helen Ward of the Cohen & Grigsby firm from

8    Pittsburgh, they are co-counsel.  We filed *pro hac vice*

9    applications yesterday, and are requesting Your Honor entertain

10   them today.

11             THE COURT:  Okay.  That's fine.  And tronc is with a

12   lowercase 'T', right?

13             MR. KLESTADT:  It is with a lowercase 'T'.

14             THE COURT:  For the benefit of the court reporter.

15             MR. WEINBERG:  Your Honor?

16             THE COURT:  Yes?

17             MR. WEINBERG:  On the phone, Mark Weinberg, counsel

18   for Versant Funding LLC.  The pre- and post-petition factor for

19   the Debtor.

20             THE COURT:  Right.  Good morning.

21             MR. WEINBERG:  Good morning.

22             MS. NAKANO:  Also on the telephone Serene Nakano for

23   the U.S. Trustee's Office.

24             THE COURT:  Okay.  Good morning.

25             MR. PASTERNAK:  So, Your Honor, with respect to what I

Metro Newspaper Advertising Services - 4/28/17                5

1   guess we'll call the second-day motions at this point.  We did

2   have a first-day hearing before Judge Lane.  We had two limited

3   requests at the time.  One was that the employee wages that were

4   caught-up in the one-week cycle prior to the bankruptcy be

5   approved within the statutory caps of § 507(a)(4).  Judge Lane

6   granted that on an interim basis.  With respect to that motion,

7   that payroll has already been made.  And as Your Honor has

8   gleaned from the papers, there's no further payroll at this

9   time.  The company is essentially dark, but lots still to do in

10  the cases we'll get to at some point in this hearing.

11          We have circulated a form of proposed final order to

12  bless that one pre-petition payroll.  The form of order was

13  reviewed by the U.S. Trustee, counsel for the committee.  And

14  the committee has given me one or two non-substantive changes to

15  the order.  And then we would request that Your Honor approve

16  that limited relief on a final basis.

17          THE COURT:  Okay.  Does anyone have anything to say on

18  that request?  I didn't see any pleadings filed in connection

19  with it.

20          (No response.)

21          THE COURT:  Hearing no one, I'll grant the motion on a

22  final basis, subject to my seeing the tweaks.

23          MR. PASTERNAK:  Of course, Your Honor.

24          THE COURT:  But I'm assuming it's just turning the

25  interim into a final with --

Metro Newspaper Advertising Services - 4/28/17                6

1        MR. PASTERNAK:  It's basically changing it to a final,

2  and then there was one decretal paragraph that authorized the

3  Debtor to honor, pay and modify.  I'm not sure why the word

4  "modify" was there anyway.

5        THE COURT:  Right.

6        MR. PASTERNAK:  So, we're going to delete the word

7  "modify."

8        THE COURT:  That's fine.

9        MR. PASTERNAK:  And that's about it.

10       THE COURT:  That's fine.  Okay.  And then the second

11  motion is for final approval of the factoring/financing

12  arrangement.

13       MR. PASTERNAK:  Yes, Your Honor.  So, at the prior --

14       THE COURT:  With Versant Funding.

15       MR. PASTERNAK:  I'm sorry, Your Honor.  So, at the

16  prior hearing, Judge Lane had given the Debtor authority to

17  factor up to $6 million, which would have been a projection of

18  what the Debtor anticipated to do over a 13-week period in

19  contemplation of the Debtor operating.

20       THE COURT:  Right.

21       MR. PASTERNAK:  So, the order was entered I believe

22  the next day after the hearing in late March.  And then the

23  Debtor actually factored about $300,000 in receivables before it

24  shut down its operation.  But those sales or receivable were

25  under that order.  And obviously, we didn't get anywhere near

Metro Newspaper Advertising Services - 4/28/17          7

1   reaching our $6 million cap.

2          THE COURT:  Right.

3          MR. PASTERNAK:  In light of what's going on in the

4   case, and with discussions with the committee, and upon the

5   consent of the factor, it's agreed that we will not treat today

6   as a final hearing.  The committee just got formed pretty

7   recently.  There are obviously events going on in this courtroom

8   today that very much impact Versant collection of receivables

9   that were factored.  And I think the parties have agreed to

10  simply put that final hearing over.

11         THE COURT:  Okay.

12         MR. PASTERNAK:  I'll just ask Mr. Weinberg if

13  that's --

14         THE COURT:  Well, could I --

15         MR. PASTERNAK:  -- his understanding.

16         THE COURT:  Before he responds to that invitation,

17  this is hypothetical at this point.  But assume for the moment

18  that say before the next hearing date the Debtor gets back into

19  business in some way, shape or form.

20         MR. PASTERNAK:  Right.

21         THE COURT:  You would have the authorization under the

22  current interim order, which you're just extending the date on?

23  Is that the thinking?

24         MR. PASTERNAK:  That's exactly right.  So, the interim

25  order didn't say the authority ends on --

1          THE COURT:  It's with a dollar amount, as opposed to a

2    date.

3          MR. PASTERNAK:  That's correct, Your Honor.  So, I

4    felt comfortable with that contingency that you just set forth

5    that we would be covered till another date.

6          THE COURT:  Okay.

7          MR. PASTERNAK:  Unless anybody disagreed with that.

8          THE COURT:  I had a couple of questions on the order.

9    And there may be an explanation for this, but there are a couple

10   of inconsistencies.  The grant of the lien --

11         MR. PASTERNAK:  Yes.

12         THE COURT:  -- in paragraph 3 has a carve out.  And it

13   includes in 'D' any assets of the Debtor which may be subject to

14   a purchase upon a security interest.

15         MR. PASTERNAK:  Right.

16         THE COURT:  And then in paragraph 6 and paragraph

17   11 --

18         MR. PASTERNAK:  Yes.

19         THE COURT:  -- the carve-out provisions are referred

20   to without that 'D'.  And it may have just been omitted.

21         MR. PASTERNAK:  Yeah, I think with respect to six, the

22   reason it's not there is because we're not talking about a lien,

23   we're talking about plan.

24         THE COURT:  Well, except that it says "and shall at

25   all times be seen to the rights of the Debtor and to the rights

Metro Newspaper Advertising Services - 4/28/17          9

1   of any person claiming a lien or security interest in any assets

2   of the Debtor.  So, it actually --

3          MR. PASTERNAK:  Oh, I see that.  Right.

4          THE COURT:  It is a priority provision.  But then it

5   has "any rights."

6          MR. PASTERNAK:  So, we should add the PMSI carve out.

7          THE COURT:  I think you should.

8          MR. PASTERNAK:  Yes.

9          THE COURT:  And similarly in --

10         MR. PASTERNAK:  Eleven.

11         THE COURT:  -- eleven.

12         MR. PASTERNAK:  Yes.  That deals with replacement

13   liens.

14         THE COURT:  Right.  And then two other points.  In

15   nine, there's an authorization.  Is it Versent (ph) or Versant?

16         MR. WEINBERG:  Either way.

17         THE COURT:  Either way.  Okay.

18         MR. WEINBERG:  Either way.

19         THE COURT:  Versant can withhold all costs and

20   expenses.  And they shall be added to the obligations as to the

21   last sentence.  The word "reasonable" should precede costs and

22   expenses.  And I normally have a 90-day evaluation period,

23   instead of a 60-day one.  Particularly when it's from the date

24   of the final order.  Now, here it doesn't really matter because

25   we're not doing a final order so that doesn't matter.  So, you

Metro Newspaper Advertising Services - 4/28/17          10

1   can ignore that.

2          MR. PASTERNAK:  Now, the word "reasonable" that we're

3   going to add, that's just in the last sentence?

4          THE COURT:  No, it's in the front.  Versant shall be

5   and hereby is authorized to withhold all reasonable costs and

6   expenses.

7          MR. PASTERNAK:  Oh.  Oh.  Really, it's upfront.  I see

8   it, Your Honor.

9          THE COURT:  It's the first -- yeah, the first line of

10  paragraph 9.

11         MR. PASTERNAK:  Okay.

12         THE COURT:  So, with those -- and you could ignore the

13  last comment that I have about 90 versus 60 days.

14         MR. PASTERNAK:  Okay.

15         THE COURT:  Because this wouldn't be a final order.

16         MR. PASTERNAK:  No.

17         THE COURT:  And it could be -- therefore, we'll have

18  some extra time to look at it.  So, with those changes, I'm

19  happy to sign an interim order.  Or schedule it --

20         MR. PASTERNAK:  So, what we could do is --

21         THE COURT:  Schedule it.  It's really an interim order

22  with those tiny changes.

23         MR. PASTERNAK:  Yes.

24         THE COURT:  Scheduling the final hearing.

25         MR. PASTERNAK:  Second interim order.

Metro Newspaper Advertising Services - 4/28/17          11

```
1          THE COURT:  Right.

2          MR. PASTERNAK:  Then we'll get a final hearing date.

3          THE COURT:  A final hearing date --

4          MR. PASTERNAK:  That's fine, Your Honor.

5          THE COURT:  -- we'll get later.  Okay.

6          MR. PASTERNAK:  All right.  And those were really the

7   only two things we had, other than I did make a very lengthy

8   presentation, I believe your law clerk might have been on the

9   phone, about the history of the case.

10          THE COURT:  That's laid out in the pleadings.

11          MR. PASTERNAK:  Yes.  I don't want to belabor the

12   record on that.

13          THE COURT:  So, I don't think I need to hear that

14   again.  I'll hear frankly anything I need to hear about it in

15   connection with the only remaining matter on the calendar, which

16   is the motion to enforce the automatic stay.

17          MR. PASTERNAK:  Right, Your Honor.

18          THE COURT:  Against tronc.

19          MR. PASTERNAK:  Right.  There were some late pleadings

20   I know.

21          THE COURT:  Right.

22          MR. PASTERNAK:  I'm not suggesting that my adversary

23   filed any pleadings.  They didn't technically.

24          THE COURT:  No.  They weren't late under the notice.

25          MR. PASTERNAK:  Right.
```

Metro Newspaper Advertising Services - 4/28/17          12

1          THE COURT:  The notice gave, frankly, people a chance

2     to make an oral opposition at the hearing.  But it just took me

3     a little while to go through them.

4          MR. PASTERNAK:  No, understood.  And then we had

5     received two declarations from customers of the Debtor which

6     have now been filed and circulated.

7          THE COURT:  Well, I actually may only just have one of

8     those.  Horizon Media?

9          MR. PASTERNAK:  No, there was one --

10          THE COURT:  Oh, no, I'm sorry.

11          MR. PASTERNAK:  The one from this morning.

12          THE COURT:  Respond 2 Communications.

13          MR. PASTERNAK:  Yes, Respond 2.

14          THE COURT:  Yes.  I have them both.

15          MR. PASTERNAK:  Yes.  Your law clerk acknowledged

16     that --

17          THE COURT:  I have them both.

18          MR. PASTERNAK:  -- you had received that --

19          THE COURT:  Yes.  I do have them.  Okay.

20          MR. PASTERNAK:  -- so we didn't drop off a hardcopy.

21          THE COURT:  All right.

22          MR. PASTERNAK:  The Response one a little bit more

23     detailed about the nature of the relationship of the Debtor and

24     you know, what the Debtor claims that there's no agency here.

25     So, how would Your Honor like to proceed in terms of the motion?

Metro Newspaper Advertising Services - 4/28/17          13

1       THE COURT:  Well, you're seeking to enforce the

2   automatic stay, so --

3       MR. PASTERNAK:  I am.

4       THE COURT:  -- you should go ahead with that.  I mean

5   I've read the pleadings on this and the cases, and I've actually

6   done some independent research too.  This wasn't scheduled as an

7   evidentiary hearing.

8       MR. PASTERNAK:  Right.

9       THE COURT:  I don't know if people here who are primed

10  to testify, but --

11      MR. PASTERNAK:  We are.

12      THE COURT:  -- I'm taking it more on the papers at

13  this point.

14      MR. PASTERNAK:  I figured and understood that, Your

15  Honor.  And if there is the need for further evidence though, we

16  feel that the facts are very compelling.  The case law, even

17  though there are cases cited both parties, are factually

18  intensive.  And what we believe is that the CBS case just could

19  not be more directly on point with the exact facts at bar here.

20  But there are a few other points that I would now like to raise

21  in response, unless Your Honor has a different agenda in terms

22  of questions.

23      THE COURT:  No, go ahead.  Go ahead.

24      MR. PASTERNAK:  So, I think one of the questions and

25  perhaps the initial pleadings still bring home the points

Metro Newspaper Advertising Services - 4/28/17          14

1   stronger.  Why does the Debtor think this is a violation of the

2   automatic stay?  The arguments have been raised; we're not

3   seeking payment directly from the Debtor; we are going under

4   third parties who are not subject to the automatic stay; and

5   those types of arguments.

6          The reason this is what the Debtor perceives this as a

7   violation, Your Honor.  362(a)(3) talks about acts that have the

8   effect of affecting property of the estate.  Again, so now the

9   argument is, well, what property of the estate are we affecting?

10  Well, it's very clear.  By going after --

11         THE COURT:  Can I cut through it?

12         MR. PASTERNAK:  Yes.  I mean unless you don't --

13         THE COURT:  I don't think you have to persuade me of

14  this.  Maybe it's for the record, but it seems to me that the

15  argument is that by going around the Debtor, based on, and

16  validly so in the letters, the Debtor's bankruptcy filing, tronc

17  is in essence, cutting the Debtor out of its business.  You know

18  it's contractual arrangements with the Debtor's customers and --

19         MR. PASTERNAK:  And our ability to collect.

20         THE COURT:  -- the Debtor's arrangement with -- I mean

21  part of the Debtor's business is being the interface between the

22  advertisers and the newspapers.  And if you cut the Debtor out

23  from being the interface, then there's no reason for the Debtor

24  to exist anymore.

25         MR. PASTERNAK:  Well, that is the practical effect of

Metro Newspaper Advertising Services - 4/28/17          15

1   what has happened here.  But on top of that, it is also

2   affecting the Debtor's ability and Versant's by virtual

3   assignment to collect our receivables.  Because as tronc goes

4   after our customer's customers, is really what they're doing,

5   then our direct customers say, we can't pay you, we don't know

6   who to pay now.  And that's affecting our ability to collect our

7   $3 million in assigned receivables.  And every day that goes by

8   -- here's the irreparable harm.  Every day that goes by, we

9   can't collect them, the factor charges increase because they're

10  based on timing of collection.

11         When we entered it into our factoring arrangement a

12  year ago, the whole industry as you have either seen or will be

13  hearing, everybody is on terms with everybody in this industry.

14  You start generally about 60 days from our customers; 60 day

15  with us paying our newspapers.

16         So, there was a very set formula that was applying

17  with Versant, and it was working very well for the Debtor's.

18  Especially when it replaced a very expensive ABL with Versant

19  and it has worked great.  but when there is now a disruption in

20  the collection, that 60 days has gone from 90 days, 120 days,

21  and it is eroding what I'll call the due from factoring.

22  Because the factor only advances 75 percent.  And at the end of

23  the day, even after it has its costs, its fees, etcetera, there

24  is still hypothetically a due from factor, which we estimate as

25  of the petition date, was no less than half a million dollars.

Metro Newspaper Advertising Services - 4/28/17          16

1          So, the reason I'm making this argument is so that the

2    argument can't be counteracted.  Well, this doesn't really

3    affect the Debtor.  It might affect Versant.  Boo-hoo.  But it

4    does affect the Debtor.  Not only with the damage it's done to

5    its customer relationships, which may even be an entirely

6    separate cause of action, but with the Debtor's equity in the

7    factored receivables.  So, that's why.  And I'll conclude on the

8    363(a)(3) issue.  Why we think it clearly applies.  And the

9    other argument that is so blatantly obvious at least to this

10   side, is that it was a complete end run of the automatic stay.

11   And none of this activity started until we filed bankruptcy.

12   Just like in the CBS case.

13          THE COURT:  Well, the letters make that clear.

14          MR. PASTERNAK:  Yes.  I don't think there could be any

15   dispute.

16          THE COURT:  The demand letters of the clients.

17          MR. PASTERNAK:  Yes, all the letters are --

18          THE COURT:  I mean what could cut through I would

19   basically say that tronc is putting pressure on you guys to pay

20   because your business is being adversely affected, pre-petition

21   amounts.

22          MR. PASTERNAK:  I mean they did pre-petition as

23   anybody who's owed money is going to try and collect money from

24   the account debtor being the Debtor here, and that's fine.  but

25   all through that process of collection, as they knew the credit

Metro Newspaper Advertising Services - 4/28/17          17

1   risk was growing, after having relied on our impeccable credit

2   with them for let's say the last ten year when they were paid

3   over $140 million by my client in full; another 5 million alone

4   in the last year.  They clearly relied on only my client's

5   credit to make decisions as to who is liable.  And when it came

6   down to the point of distress in the last year really basically

7   is when the terms were getting modified, the parties went into a

8   workout I would say.  But all of the communications dealing with

9   that workout again are only between the Debtor and tronc.

10          THE COURT:  Well, so I guess you're leading into the

11  main issue as I see it at least, which is, it seems to me that

12  your argument that the stay is being violated makes sense if the

13  relationship that counts is between tronc and the Debtor.

14          MR. PASTERNAK:  Alone.

15          THE COURT:  Not between tronc and the advertisers.

16  And on your point that wasn't in the papers, but that you raised

17  today that the receivables really are the Debtor's, as opposed

18  to the advertisers.

19          MR. PASTERNAK:  Yes.  Absolutely.

20          THE COURT:  Because that's tronc's point.  It says

21  well, it's very nice that the Debtor is acknowledging that

22  they're liable to us, but the advertisers are too.

23          MR. PASTERNAK:  But they have to prove there is a

24  course in dealing here, that there is an agency relationship.

25  And you have to get around Judge Sotomayor's decision that

Metro Newspaper Advertising Services - 4/28/17          18

1   they're equitably estopped from making those arguments now.

2   It's very convenient that this all has come to light post-

3   bankruptcy.

4          THE COURT:  I'm sorry?  Judge Sotomayor's decision in

5   which case?

6          MR. PASTERNAK:  I'm sorry.  In CBS.  That was not --

7          THE COURT:  That's Judge Wyatt's decision.

8          MR. PASTERNAK:  Yes.  I'll get back to Judge Sotomayor

9   in another decision.

10          THE COURT:  I don't think she was sitting then.

11          MR. PASTERNAK:  No, no, no.  but we're going to talk

12   about Justice Sotomayor --

13          THE COURT:  Okay.

14          MR. PASTERNAK:  -- because of the fine prints argument

15   that has now been raised on the website.

16          THE COURT:  All right.

17          MR. PASTERNAK:  She has clearly disposed of that as

18   having any legal validity or applicability here.  But yes, I'm

19   sorry.  Getting back to the CBS court case, there's a legal

20   conclusion that there's an equitable estoppel.  And it just

21   couldn't be more on point with what we have here.  You know

22   there are cases that go both ways based on the facts and you can

23   clearly distinguish Watt; you can clearly distinguish *Burdick*.

24   In *Burdick*.  In *Burdick*, I mean the underlying advertiser, which

25   would be our customer, was making payments to the newspaper.  I

Metro Newspaper Advertising Services - 4/28/17          19

1   mean that's an entirely different objective cause of dealing.

2          I mean the course of dealing here is laid out for us

3   in two declarations from customers of the Debtors.  Tronc never

4   had any communication, any dealings, any demands, any invoicing,

5   nothing.  And there's a reason for that.  (A) They relied on our

6   creditworthiness over the years, which had been impeccable until

7   this latest distress.  I'm sorry, I lost my train of thought

8   there.

9          And again, it's very clear the way the Debtor's

10  business operates that the Debtor is not just some kind of a

11  pass-through here, Your Honor.  The Debtor is not a conduit.  It

12  is not an agent in the traditional sense.  The Debtor performs a

13  variety of services to its customers.  It doesn't just take an

14  ad, send it over to the newspaper, and then add some automatic

15  fixed marketing.  It's very clear when you read those two

16  declarations that that's simply not the case.

17          THE COURT:  The two advertiser declarations?

18          MR. PASTERNAK:  Yes, that's correct.  You know, the

19  dealings were always between Debtor and customer that there is a

20  lot that is done by the Debtor.  The Debtor is not an

21  advertising agency.  That's another misnomer you'll see in my

22  adversary's papers.  The Debtor is more of an independent

23  contractor.  It is more of a consultant.  The Debtor invests

24  millions of dollars in its own technology to come up with

25  products that it uses to then take its customer's requests.  Say

Metro Newspaper Advertising Services - 4/28/17        20

1    I want to put an ad in 18 papers in the Midwest region.  Then my

2    client identifies the target markets, goes out, and has the

3    entire discretion on pricing, and then places the ad, gets

4    invoiced in this case, in every case, because that's the custom

5    of dealing in this industry.  Gets invoiced, and then my client

6    gives an entirely different type of invoice to its customer

7    which reflects the overhead component, the services, the

8    expertise that it provides to its client in coming up with

9    whatever price.

10        The tronc, what I call the fabricated invoices, which

11   were the ones that were made up post-petition, don't even

12   correspond with whatever pricing the Debtor got from the

13   newspaper.  It is not commensurate.  In fact, it overcharges

14   customers of customers.  They have no idea what we charge our

15   customers.

16        THE COURT:  Well, that was a question I had.  The

17   objection and the invoices to the customers referred to Metro

18   Newspapers commission.  Is there a commission in the billing?

19        MR. PASTERNAK:  No, there's no commission.  That is

20   another falsehood.

21        THE COURT:  Because that is a factor in a lot of the

22   cases.

23        MR. PASTERNAK:  There is a discount that the Debtor

24   achieves from the paper because they are doing the papers a

25   favor by not having to do all of this work in dealing with a

Metro Newspaper Advertising Services - 4/28/17          21

1   particular advertiser.  And so, the Debtor gets back a discount

2   in the price for the placement of the ad.  That's part of the

3   Debtor's profit.  But that is not a direct pass-through to the

4   customer.  If you look at our invoicing to our customer, they

5   don't match up with what tronc has created.

6        THE COURT:  Do I have an invoice to a customer in the

7   record?  I'm not sure I do.  I'm not talking about tronc's

8   invoices; I'm talking about one from --

9        MR. PASTERNAK:  No, no.  We actually were talking

10  about in preparation for today's hearing.  So, my clients were -

11  - although we were scrambling to find a copy in my file of what

12  a typical invoice looks like from Debtor to custody, we

13  certainly can describe it to you in great detail today.  And

14  perhaps we can spend a minute or two so that you understand --

15       THE COURT:  But what you're saying is it includes

16  other charges for services rendered by --

17       MR. PASTERNAK:  Sure.  It includes a number of fees,

18  service-related charges to the customer that go way beyond some

19  pass-through discount that we achieve with the newspapers for

20  our efficiency and making life a little easier for them in this

21  particular industry.  I mean that's why this industry was

22  created.  This was created by the newspapers itself because they

23  didn't want to have to deal with 18 million advertisers or

24  advertising firms.  This is a distinct micro-industry within a

25  macro-industry.  And the course of dealing here is consistent.

Metro Newspaper Advertising Services - 4/28/17          22

1   And has been between these parties for sure.

2          THE COURT:  There is a line that appears in a lot of

3   the case law.  It says that generally speaking, although each

4   case should be reviewed on its facts, this is an agency

5   relationship.  And that appears in a number of a cases.  There's

6   one from Maine, Maine Superior Court, 1992.  The quote from

7   Judge Ryan gets picked up.  Or the case from Judge Ryan gets

8   picked up in three or four, five, six different cases from

9   around the country.  Those cases all acknowledge that the facts

10  govern.  But when you say this micro-industry was created to be

11  this way, the sort of general initial gloss on it seems to be

12  contrary to that, that it's an agency relationship, and not a

13  separate relationship.

14         MR. WEINBERG:  Your Honor?

15         THE COURT:  Yes?  Hello?

16         MR. WEINBERG:  This is Mark Weinberg, if I may?

17         THE COURT:  Could you speak a little louder, Mr.

18  Weinberg?

19         MR. WEINBERG:  Yes.  Can you hear me now?

20         THE COURT:  Yes.  Even louder would be better.

21         MR. WEINBERG:  Okay.  If I may, there is a

22  distinction.  I think it's contrary to what was represented in

23  tronc's papers.  But there is a big distinction that seems to be

24  getting missed here, and that is the fact that we have, for the

25  most part, advertisers; we then have advertising agencies; and

Metro Newspaper Advertising Services - 4/28/17          23

1   then we have Metro in the middle.  So, it's getting lost on the

2   fact that tronc didn't even know who the advertising agencies

3   were.  They obviously knew who the advertiser was, because

4   that's who was advertising in their papers.  But the fact is

5   Metro was dealing with these advertising agencies.  Most of

6   these cases that have been cited, there is not a Metro in the

7   middle.  And when Mr. Pasternak speaks of this specialized

8   industry, it's the industry of ad-placement by Metro.  Metro is

9   not an advertising agency.

10          THE COURT:  So, Metro is not Mad Men?

11          MR. PASTERNAK:  Correct.

12          MR. WEINBERG:  That's correct.

13          THE COURT:  Okay.  Well, that does seem to be a

14   distinguishing factor in the case law.  Both ways, frankly,

15   because I think some of the case law in your favor, Mr.

16   Pasternak, deals with advertising agencies too.

17          MR. PASTERNAK:  It does.  But it's logical that how

18   could the Debtor be an agent for customers of its customers.  I

19   mean that's two levels down.  We have no dealings with the

20   customers.  So, that argument must fail.

21          THE COURT:  Okay.

22          MR. PASTERNAK:  You know one of the issues that was

23   raised in the papers was this fine print on the website.  I

24   would refer Your Honor to Justice Sotomayor's Second Circuit

25   decision on that.

Metro Newspaper Advertising Services - 4/28/17          24

1      THE COURT:  No one signed any contract consistent with

2  that website under the UCC and under the case law --

3      MR. PASTERNAK:  It just doesn't fit into any of the

4  case law.

5      THE COURT:  No one adopted the website, right?

6      MR. PASTERNAK:  No.  There's no binding, there's no --

7      THE COURT:  There's no evidence at least in the record

8  that that's the case.

9      MR. PASTERNAK:  Not only is there no binding with the

10  Debtor --

11      THE COURT:  I mean to me, the website is kind of like

12  -- unless there's evidence showing that people actually

13  performed under it, it's like the guy in the office saying I

14  declare bankruptcy, you know?  Thinking that that actually meant

15  something.

16      MR. PASTERNAK:  Well, I mean it goes beyond that

17  because you're talking about two levels down of somebody being

18  bound by it.

19      THE COURT:  Well, I understand.  Because it's to the

20  advertisers and it doesn't really talk -- at least if I accept

21  what I've just been told about this not being an advertising

22  agency, paragraph 11 refers to advertiser represented by agency.

23  And of course, one has to parse out what that means.  Does that

24  mean an advertising agency, or does it mean --

25      MR. PASTERNAK:  And then you read the cases and its

Metro Newspaper Advertising Services - 4/28/17          25

1   using words like agency and advertising.  I mean it gets very

2   confusing, but --

3          THE COURT:  Well, in any event, it seemed to me this

4   was the only -- I'm going to hear from Mr. Klestadt obviously,

5   but it did seem to me that the only factual argument for the

6   assertion that the people who are receiving the bills are

7   obligated on the bills.  Is this printout, which says effective

8   date March 18, 2016, of advertising agreement standard terms and

9   conditions for placement of print, digital and reprint ads.  And

10  no one has said that anyone actually accepted those terms.

11         MR. PASTERNAK:  No.  Not only the Debtor, certainly

12  not the customers.

13         THE COURT:  So, then you're left with the legal

14  argument, which I've already briefly discussed that in the

15  absence of the facts at least start the analysis.  But can I

16  change --

17         MR. PASTERNAK:  Of course, Your Honor.

18         THE COURT:  direction a little bit here?

19         MR. PASTERNAK:  Sure.

20         THE COURT:  The Debtor is not operating at this point.

21         MR. PASTERNAK:  That's correct.

22         THE COURT:  If I found that tronc was in violation of

23  the automatic stay and should stop sending out these letters; in

24  fact, should rescind them, leaving for a later day all the

25  damages issues, would the Debtor be able to resume business?

Metro Newspaper Advertising Services - 4/28/17          26

1   Because that affects the speed with which I'd deal with this.

2   If it's not, then I'd like to have a little bit more time to

3   think about it, and give the parties a little bit more time to

4   brief it and have a more complete factual record.

5          MR. PASTERNAK:  Again, what we have argued, and I'm

6   not trying to get around your answer, because I'm not sure of

7   the answer.  But the only thing I can argue to Your Honor is

8   every day that goes by, there's harm.

9          THE COURT:  Right.  Well, that's the nature of the

10  automatic stay.

11         MR. PASTERNAK:  And it gets worse.

12         THE COURT:  And I say this to every party who is

13  alleged to be violating the automatic stay, whether it's a

14  mortgage lender or a trade vender or tronc, the stay is there,

15  it's automatic, it's a statutory injunction.  If you're wrong in

16  not having violated it, you're really at risk.  Do you really

17  want to do that pending further determination?  The ready,

18  shoot, aim approach is a very dangerous approach.

19         MR. PASTERNAK:  I understand that and --

20         MR. KELLEHER:  Is that our opportunity to respond,

21  Your Honor?

22         THE COURT:  Yes.  Just on that issue.

23         MR. PASTERNAK:  Right.  May I sit, Your Honor?

24         MR. KELLEHER:  I'll try to limit it, but there's a lot

25  of things in that issue, Your Honor.  First of all, William

Metro Newspaper Advertising Services - 4/28/17          27

1    Kelleher for tronc.  Thank you for granting our *pro hac vice*

2    motions.

3         MR. KELLEHER: We take the automatic stay seriously.

4    We understand it; we get it.  We didn't hear that from you, with

5    all due respect.  We do understand that.  But I think it goes in

6    large part to the question you asked Mr. Pasternak.  What we're

7    accused of doing is sending letters, dated April 6 and April 7.

8         THE COURT:  Well, you did send them out.

9         MR. KELLEHER:  We did.  We admit it.  Absolutely.  We

10   sent letters out.  This Debtor filed on March 27; on March 31,

11   it laid off substantially all its employees.  By April 5, it

12   laid off the rest of its employees, other than a skeleton crew

13   so they can drum up allegations against us.  Our letters went

14   out after that.  There is no conceivable causal effect between

15   our letters and the Debtor's business problems.

16        THE COURT:  Well, then why send out the letters?

17        MR. KELLEHER:  Because we have an independent

18   contractual right --

19        THE COURT:  No, what I'm saying is, why take that

20   risk?  I mean are you facing a limitations defense from the

21   advertisers?  I mean if in fact the Debtor is their agent, why

22   would there be any rush to do it?

23        MR. KELLEHER:  We're entitled to get paid.  We lost

24   over --

25        THE COURT:  No, no, no, no, no.  Not in the face of

Metro Newspaper Advertising Services - 4/28/17          28

1   the automatic stay.  That's why I don't think you really took it

2   that seriously.  There's no rush, right?  There's no rush to

3   send out those letters.  You're not under any legal risk if you

4   don't send them out.

5          MR. KELLEHER:  We're in the same situation as the

6   Debtor.  We lost $2 million because of services we provided; not

7   because of services that Metro provided.  They're trying to

8   benefit and hide behind the stay to take advantage of the ads we

9   published.

10         THE COURT:  But why won't the money be there?  And

11  you're cutting off one source of the money in the first place.

12  I guess I don't understand why you don't seek relief from the

13  stay to do this?  In which case the Court can actually decide

14  whether these people are entitled to get their money anyway, and

15  whether you're mocking up the Debtor's business.

16         MR. KELLEHER:  We sent letters to non-debtors.

17         THE COURT:  No, no. You say that.  You say that.  And

18  you say you have the right to do that.  The whole point of the

19  automatic stay that Congress enacted, and it's not the Debtor

20  asking for an injunction, this is a statutory injunction; is to

21  prevent self-help.  So, you're presuming the legal relationship.

22  And it's quite clear, if anything, that that legal relation

23  isn't clear.  And yet you're taking a step, whereby, the very

24  act of taking the step, affects the legal relationship.  So, I

25  guess what I'm saying is why do it?  Why not put it on hold

Metro Newspaper Advertising Services - 4/28/17          29

1   until the relationship can be decided, as Congress meant, by

2   determining whether the stay applies in first place by making a

3   motion for relief from the stay?

4        Now, I would understand if you were under acute time

5   pressure.  Either from a statute of limitations period or some

6   other time pressure affecting your business, but that just goes

7   to my scheduling a hearing on relief from the stay, which I

8   could do on an emergency basis.  So, again, this seems to me to

9   be a very risky strategy.

10       MR. KELLEHER:  I don't believe we're under, that I'm

11  aware of, a statute of limitations' issue.  But you did hear Mr.

12  Pasternak this morning say, "Oh, they should be estopped."  The

13  answer to that is no, we shouldn't.  As soon as the issue --

14       THE COURT:  Well, the estoppel argument is based on

15  the pre-petition conduct.  Post-petition, totally different.

16       MR. KELLEHER:  But the recipients of those letters are

17  not in bankruptcy.  There's no post-petition with respect to

18  them.  They're not in bankruptcy.

19       THE COURT:  They're not arguing estoppel; it's the

20  Debtor that's arguing estoppel.

21       MR. KELLEHER:  The Debtor wants to waive the estoppel

22  argument, that's fine with us.  But we've got to defend that; we

23  have to respond to that.

24       THE COURT:  You have to respond to the fact that you

25  didn't act on this pre-petition when there was a financial

Metro Newspaper Advertising Services - 4/28/17          30

1   problem.  But that's not for the advertisers; that's for the

2   Debtor.  I just don't see why this is being done this way.

3        MR. KELLEHER:  We're happy to file a motion for relief

4   from stay, and have it considered by the Court.

5        THE COURT:  But in the meantime, you in essence have

6   decided how that motion occurs by sending out the letters, and

7   not putting it on hold.  I mean, that to me is very problematic.

8        MR. KELLEHER:  Well, we apologize to the Court.  It

9   wasn't to violate the stay.

10       THE COURT:  No, it's not a question of apology, it's

11   just the law.  The whole point of the automatic stay is people

12   don't engage in self-help.  They don't presume the answer.  I

13   mean it's one thing if you know the answer.  If you're drawing a

14   letter of creditor, you don't have to wait, because you know the

15   answer.  Notwithstanding the bravado in the response to Mr.

16   Pasternak's email, I know, because I've looked at this, you

17   don't know the answer.  He doesn't really know the answer

18   either.  And in those circumstances, no one should be acting

19   contrary to the automatic stay.  Congress had a stop, look and

20   listen in the automatic stay.

21       MR. KELLEHER:  And Congress also said like the letter

22   of credit situation.

23       THE COURT:  This isn't a letter of credit situation.

24   That's one finding I can make today.  And I can find today that

25   you're in violation of the automatic stay merely because you're

Metro Newspaper Advertising Services - 4/28/17          31

1   doing self-help in a situation where there is substantial doubt

2   that you have a right to do so.  And it has consequences.  The

3   facts ultimately may turn out that the Debtor's business was DOA

4   on the petition date.  But at the same time, why do this if that

5   isn't the case, but it's DOA tomorrow?

6          MR. KELLEHER:  Well, that's not the case.  It was DOA

7   before we sent the letters.

8          THE COURT:  Well, you know what?  I don't know that.

9   I don't know that.  And frankly, it doesn't make sense to me

10  this rush.  It just doesn't make sense.  There seems to be an

11  ulterior motive behind it, because again, the policy of the

12  stay, unless it's crystal clear, is you don't shoot first and

13  aim letter because it's a statutory injunction.  Which by the

14  way, deals with the jurisdiction on procedural arguments you've

15  raised.  The Debtor is not seeking an injunction; there is an

16  injunction.  And Congress did not intend to have the adversary

17  proceeding rules apply when someone is violating an injunction

18  that may be killing a Debtor's business or providing them with a

19  house, or any of the other reasons that the automatic stay

20  protects property.

21         It doesn't require the timing of notice for a

22  complaint, and an answer, and discovery to enforce the automatic

23  stay.  it doesn't provide the burden to be on the Debtor to

24  establish an injunction.  It's a statutory injunction.  The

25  burden is on the party who would be perhaps entitled to relief

Metro Newspaper Advertising Services - 4/28/17                32

1   from the stay to seek it.  But again, unless it's crystal clear,

2   they should be seeking relief.  This isn't a guarantee

3   situation.

4        You have to prove in the first instance that these

5   people that you're gunning now actually owe an obligation to

6   you, and that you can circumvent the Debtor in seeking that

7   obligation to be paid.  Notwithstanding your long-time

8   contractual relationship with the Debtor.  So, there's a real

9   risk there.  And I just don't understand why instead of making a

10  motion with proper briefing, other than between four o'clock

11  yesterday afternoon and 10:30 this morning, for the Court to

12  review it, that that's not being done.  And to me, that's a

13  violation of the automatic stay.  That's not how bankruptcy is

14  supposed to work.

15       MR. KELLEHER:  To use Your Honor's words, we didn't

16  think we were shooting at the Debtor.  And --

17       THE COURT:  Well, but you're clearly shooting at the

18  Debtor.  You're basically saying, the Debtor is not going to be

19  conducting the type of business that the Debtor's business is.

20  We're dealing with you directly now.  Period.  You know, come

21  on.  Let's be real.

22       MR. KELLEHER:  That's actually not what we said.

23       THE COURT:  Shall we read the letter together?  You

24  know I give you points for candor, whoever drafted the letter to

25  the customers.

Metro Newspaper Advertising Services - 4/28/17          33

1      MR. PASTERNAK:  It's Exhibit C to the Debtor's motion,

2  Your Honor.

3      THE COURT:  Right.  Right.  Right.  I have the one to

4  insight pharmaceuticals.

5      MR. PASTERNAK:  Right.

6      THE COURT:  "As you are aware, Tronc, Inc. (formerly

7  Tribune Publishing, "tronc") has provided substantial

8  advertising services to and for the benefit of Insight.  The

9  insertion orders for tronc services were often placed on your

10 behalf by your agent, Metro Newspaper Advertising Services, Inc.

11 ("Metro")."  Now, let's just stop there.

12      There's a significant factual dispute on that issue.

13 All right?  "And certain invoices", let's stop there.  Were

14 there any invoices that weren't issued directly to Metro, as

15 your agent?  I mean again, major factual dispute.  Right?  Was

16 Insight ever billed directly when the orders were placed by

17 Metro?

18      MR. KELLEHER:  No.  Not prior to this.

19      THE COURT:  Okay.  So, it says certain invoices were

20 issued directly to Metro.  As if there were really invoices

21 issued to Insight.  And then it says "As you know, Metro has

22 filed Chapter 11 bankruptcy in the United States Bankruptcy

23 Court for the Southern District of New York.  Accordingly, no

24 further invoices for any pre-petition bankruptcy services will

25 be issued to Metro at this time."

Metro Newspaper Advertising Services - 4/28/17          34

1     MR. KELLEHER:  Your Honor, can I go back to your

2  "certain invoices" question?

3     THE COURT:  Yes.

4     MR. KELLEHER:  The way this works is we would get a

5  purchase order called "Insert Orders" in the print advertising

6  business that would have our price on it.  And it would have

7  Metro's commission and another commission if -- and by the way,

8  notwithstanding the representations this morning, there were not

9  always intervening advertising agencies in these arrangements.

10  But sometimes you would have second commission on there.  That's

11  how Metro gets paid by its principal.  Not us.  We don't pay

12  Metro, they have their relationship directly with the

13  advertiser.  That amount for our price is the certain invoice

14  that's referenced in there.  So, there is a distinction between

15  what we're charging for publishing, and what Metro charges for

16  whatever else Metro charges, the way it gets paid by its

17  principal.  And that's the only thing that's in --

18     THE COURT:  You think that's how Insight would read

19  this?

20     MR. KELLEHER:  I think when they look at what's

21  attached, yes.

22     THE COURT:  Well, I guess we'll see some day.  But it

23  just seems to me that you are unilaterally deciding how you

24  should be paid.  And this is not a guarantee.  Is there anything

25  in writing from any of these people you send letters to where

Metro Newspaper Advertising Services - 4/28/17          35

1   they say we're liable?

2          MR. KELLEHER:  From any of the people after we sent

3   these letters?

4          THE COURT:  Yes.  Or before.

5          MR. KELLEHER:  Yes.  Some of the responses we got when

6   Metro went out of businesses, we're going to take over Metro's

7   business, or we're going to deal with you direct.

8          THE COURT:  Right.

9          MR. KELLEHER:  And just like the standard and customs

10  in this industry, some of them say we want you to look only to

11  the advertising because the advertiser is liable as the

12  principal.  The exact opposite of what they're saying this

13  industry is, and consistent with what this Court said in the

14  *Burdick* situation.  It is known out there that the advertisers

15  are liable.  And that's correspondence that tronc and this

16  Debtor has had too, our right to go after the advertiser.  This

17  didn't just come up post-bankruptcy.

18          THE COURT:  Is that in the record at all?

19          MR. KELLEHER:  No.  We have a witness prepared to

20  testify about that.  And, Your Honor, we'll request, we'll beg,

21  an opportunity to file a relief from stay motion and tee the

22  issue up for you.

23          THE COURT:  In the meantime, I think you should tell

24  these people, while you're fully reserving your rights, that

25  you're rescinding the bills.  I think you're violating the stay,

Metro Newspaper Advertising Services - 4/28/17          36

1  unless you do that.

2          MR. KELLEHER:  As long as we can fully reserve our

3  rights, Your Honor, we're happy to do that.

4          THE COURT:  It's just that you're walking into a big

5  problem if you don't do that.

6          MR. KELLEHER:  We think that's in part because the

7  facts are misrepresented to you.  We understand there's an

8  issue --

9          THE COURT:  Well, but that's what the automatic stay

10 is all about, so this Court will have some time to sort out

11 those facts without the Debtor's business or Debtor's house

12 being lost.

13         MR. KELLEHER:  We understand, Your Honor.  We're happy

14 to file that.

15         THE COURT:  Okay.  And I appreciate your saying the

16 Debtor's business was already lost, but I don't know that today.

17 And if the continuation these billing notices is causing it to

18 get worse, that's a real problem.  So, I'm happy to adjourn

19 this, so parties can develop the facts; we can have an

20 evidentiary hearing noticed with proper preparation for it, as

21 long as the word goes out to each of these people that got these

22 letters that for the time-being with fully reserving our rights,

23 you are to perform as you previously performed.

24         MR. PASTERNAK:  Your Honor, also anyone who they may

25 have communicated with.  We don't even know the --

Metro Newspaper Advertising Services - 4/28/17          37

1          THE COURT:  Well, I don't know who -- I mean I'm

2    assuming there were just letters, but maybe there --

3          MR. PASTERNAK:  I don't know.

4          THE COURT:  Were there phone calls also?

5          MR. KELLEHER:  One thing we will agree, and I think it

6    was your comment, it might have been his; we have been candid.

7    We identified everybody who got a letter.

8          THE COURT:  All right.

9          MR. KELLEHER:  And a footnote to the pleadings.

10          THE COURT:  All right.  But Mr. Pasternak's point was

11    a little different than that.  Are there also separate companies

12    that got phone calls or --

13          MR. KELLEHER:  Not to my knowledge.

14          THE COURT:  Okay.

15          MR. KELLEHER:  But we can confirm that.

16          THE COURT:  I think it's a fair point though.  I think

17    it shouldn't just be the people who got letters.  If there's

18    anyone who has been told "pay us directly" that should be

19    rescinded with a full reservation of rights.

20          MR. KELLEHER:  Coincidentally, the two declarations

21    that were filed that I didn't see until ten minutes after the

22    hearing was supposed to start --

23          THE COURT:  Right.

24          MR. KELLEHER:  -- did not get communications from us.

25    I don't know how they got them, they didn't get them from us.

Metro Newspaper Advertising Services - 4/28/17          38

1   And they raise exactly the issue.  They want a declaratory

2   judgment that there's no double liability.

3          THE COURT:  No, I understand.  And there are important

4   issues at stake here that I can't sort out today.  We don't have

5   half the witnesses here that we need to have for it.  And it's

6   not scheduled as an evidentiary hearing.  For example, neither

7   of you guys, I think, cited this, but there's an opinion by

8   Judge Glenn from 2010, *In re Richards Fliss Clark & Co., Inc.*,

9   2010 Bankr. Lexus 3923 (Bankr. S.D.N.Y. Nov. 1, 2010), where the

10  issue was whose property is the payment.  Again, that was why I

11  was questioning Mr. Pasternak about the nature of the

12  receivable.  And frankly the issue of who the customers really

13  are was really flagged for me at least during the hearing.

14         So, all of those issues I think need to be sorted out

15  carefully with discovery and with factual development in an

16  evidentiary hearing.  But I can't do that and leave the gunning

17  notices out there, because that's self-help, and that has to

18  stop.

19         MR. KELLEHER:  Your Honor, we'll file a relief from

20  stay motion, and we'll; we'll send letters to the 19 folks who

21  got them saying that all this is on hold until you resolve the

22  motion, and --

23         THE COURT:  Well, it's not just on hold.  They should

24  perform as they've previously performed.

25         MR. KELLEHER:  I don't know what that means, Your

Metro Newspaper Advertising Services - 4/28/17          39

1   Honor.

2          THE COURT:  Well, they're supposed to pay the Debtor.

3   Right?  Or if they pay you directly.  They're just supposed to

4   perform as they previously performed, as they previously paid

5   their bills until this is sorted out.

6          MR. KELLEHER:  That gets to the question of the

7   declaratory judgment that the others want you to issue.  That

8   exposes them to double-liability.

9          THE COURT:  No, this is just for the time-being, until

10  the issues to be raised in a lift-stay motion are sorted out.

11         MR. PASTERNAK:  Your Honor, I would request that, at a

12  minimum, the Debtor get to review this form of notice.

13         THE COURT:  Oh, yeah, of course.

14         MR. PASTERNAK:  And perhaps the Court, more

15  importantly.

16         THE COURT:  No, I think as part of a scheduling order,

17  the notice should go out.  You should review it, and then it

18  should be attached to the order.  And I can say that in light of

19  this notice, and the representation that no one else has been

20  contacted, other than the people receiving this notice, I'll

21  adjourn the hearing on this motion, to coincide with the hearing

22  on the lift-stay motion.

23         MR. PASTERNAK:  And I would ask that Your Honor just

24  retain -- obviously, you have jurisdiction.  But if we can't get

25  on the same page with this language, maybe Your Honor would

Metro Newspaper Advertising Services - 4/28/17          40

1   break the tie.

2          THE COURT:  Then the order will say what the letter

3   should say.

4          MR. KELLEHER:  Your Honor, I'm sorry, I didn't

5   understand that question.

6          THE COURT:  If you can't agree on this letter,

7   although I'm assuming you can, because I've been pretty clear.

8          MR. KELLEHER:  No, no.  I thought he had some question

9   about wanting us to stipulate to jurisdiction.

10         THE COURT:  No, no, no, no.  No, he just wanted -- I

11  think what Mr. Pasternak was saying is if you two can't agree on

12  the form of this letter, then they reserve the right to submit

13  an order, which should say what it should say, I would put it in

14  the order.  But you'll agree it, I'm confident.  But if not,

15  I'll do that.

16         Now, I think it's --

17         MR. WEINBERG:  Your Honor?

18         THE COURT:  Yeah, go ahead.

19         MR. WEINBERG:  This is Mark Weinberg again.  I have no

20  idea what this letter is going to actually look like.  But my

21  sense is that if it's not fairly strong, it's going to have

22  absolutely no affect.

23         THE COURT:  Well, no, I need --

24         MR. WEINBERG:  We all know people who are concerned

25  about having to pay twice are going to pay no one.  So, a lot of

Metro Newspaper Advertising Services - 4/28/17          41

1   damages has clearly already been done.  The question is, is

2   there a way to undo it --

3            THE COURT:  Well, they are to pay the Debtor as per

4   their normal practice, because this demand letter is being

5   rescinded with a reservation of rights.

6            MR. WEINBERG:  Okay.

7            THE COURT:  You know, if they don't pay the Debtor,

8   they're in trouble.  So, you know, they need to pay.  They can't

9   just hold it.  They'd be in violation of the automatic stay.

10           MR. WEINBERG:  The devil will be in the details.  I

11  guess the question is how much fear is put into them by

12  reservation of rights.

13           THE COURT:  They don't have a set off right, I don't

14  believe.

15           MR. KELLEHER:  Your Honor, we can't agree in the

16  letter that it will say they should pay the Debtor.  We can

17  agree as you said that they follow their normal practice.  We're

18  find with that.

19           THE COURT:  Okay.  I'm assuming that, yes, that's

20  fine.  They follow their normal practice.

21           MR. KELLEHER:  We can argue later as to what that

22  means or the consequences of that.  But we can't stipulate that

23  they can pay the Debtor.

24           THE COURT:  No, no.  Their normal practice is with the

25  Debtor.

Metro Newspaper Advertising Services - 4/28/17          42

1      MR. KELLEHER:  We don't know that, but that's fine.

2   We're okay with that.

3      THE COURT:  Okay.  That's fine.  What I was going to

4   say is that assuming we get over that hurdle, and I should have

5   that on Monday.  I need to get that order out with that letter

6   attached to it.  And if you agree on the form before then, you

7   can send it out before Monday.

8          After that's done, you two or you three, Mr. Klestadt,

9   should talk about, and also, counsel to the committee, the

10  process for the evidentiary hearing on the lift-stay motion, and

11  on the remaining portion of this motion, which merits an

12  evidentiary hearing.  And to my mind, you should probably

13  sequence it so that the first issue is the agency issue, and the

14  second issue is any damages.  I mean obviously if the Debtor is

15  a mere agency, and the customers are liable, then they're

16  minimal damages.

17      MR. PASTERNAK:  Right.

18      THE COURT:  If any.

19      MR. PASTERNAK:  There might be damages.

20      THE COURT:  There might be, but I think we should

21  focus on that issue first, because that's to me not necessarily

22  a complete gate-keeping issue but the issue to be focused on

23  first.  And then on damages.  Probably at a separate hearing.

24  And, frankly, if you know the answer to the first hearing, you

25  can probably settle the damages issue.

Metro Newspaper Advertising Services - 4/28/17          43

1       The second point, Mr. Pasternak and Mr. Klestadt know

2   this, but I want to get it on the record.  My normal practice

3   with evidentiary hearings is that the parties present their

4   direct testimony by declaration or affidavit and then the

5   witness is there for cross examination and redirect.  Obviously

6   if a witness is under your control, then direct is live.  You

7   have to make sure that person is here of course.

8       Secondly, I expect the parties to identify the

9   exhibits they intend to introduce, meet and confer, and use

10  their best efforts to agree on the admissibility of as many of

11  them as they can, and have a joint exhibit book, and present

12  that along with the declarations three days before the hearing

13  to chambers.  If it's a weekend, five days before the hearing.

14  But three business days before the hearing.

15      I'm not a big fan of motions *in limine*.  I usually

16  deal with evidentiary objections at the hearing.  If there's

17  something that really is going to affect your whole trial

18  strategy, then I'll hear motions *in limine* promptly before the

19  hearing.  But hopefully you won't -- you know, if you have

20  disputed exhibits, just put it in a different binder.

21      MR. KELLEHER:  And I apologize, Your Honor.  This is

22  probably out of ignorance for your practice, but I didn't hear a

23  discovery schedule in there.  Is that standard in your

24  scheduling orders?

25      THE COURT:  Well, I don't know how much discovery you

Metro Newspaper Advertising Services - 4/28/17          44

1   need.  But frankly, if the letters have been rescinded, I think

2   we can follow the Part 7 rules for the rest of this.

3          MR. PASTERNAK:  Meet and confer.

4          THE COURT:  Yes.  So, you can set up a discovery

5   schedule that way.  You know, discovery in bankruptcy is

6   expedited.  It's not the normal six months to a year that

7   litigators are used to.

8          MR. KELLEHER:  We'd be delighted for that.

9          THE COURT:  And I'm assuming the parties have thought

10  a fair amount about this before they took the actions they did.

11         MR. KLESTADT:  Your Honor, Tracy Klestadt.  It may be

12  helpful for us in terms of framing the schedule and the calendar

13  to have an idea of when Your Honor may be available for the

14  evidentiary hearing.

15         THE COURT:  Well, you can talk to Ms. Li about that.

16         MR. KLESTADT:  Okay.

17         MR. PASTERNAK:  And work back from a date.

18         THE COURT:  Right.  Right.

19         MR. PASTERNAK:  Very well, Your Honor.  I think that's

20  everything to do with our motion for now.

21         THE COURT:  Okay.  The committee just got organized.

22  They may want to weigh in in some way, shape or form.  I'm happy

23  to have a pre-hearing conference, which I can do by phone if

24  there are issues that come up.  I have a form of pre-trial order

25  on the website.  If you want to memorialize a schedule, you can

Metro Newspaper Advertising Services - 4/28/17          45

1  submit that.

2           MR. PASTERNAK:  We'll work it out, Your Honor, I'm

3  sure.  At least that part of it.

4           THE COURT:  All right.

5           MR. PASTERNAK:  Thank you very much, Your Honor, for

6  entertaining us on short notice.

7           THE COURT:  Okay.

8           MR. PASTERNAK:  And welcome back.

9           THE COURT:  I guess the one other thing, and I'm not

10  sure which of you said this, but as it's teed up right now for

11  matters that I'll be hearing between the Debtor and tronc, this

12  isn't really a declaratory judgment that would be binding on the

13  advertisers or the customers or however you want to describe the

14  principals.  You know, whichever label people want to pin on

15  them.  Their rights may or may not be --

16           MR. PASTERNAK:  Governed.

17           THE COURT:  The Debtor may be collaterally estopped

18  vis-à-vis them, and you guys may be collaterally estopped.

19  They're not going to be a party to this.  So, it's not really a

20  declaratory judgment action ultimately on their rights.  It's

21  just --

22           MR. KELLEHER:  Understood, Your Honor.  It might be

23  the law of the case, but --

24           THE COURT:  Well, no.

25           MR. KELLEHER:  Depending on the facts, right?

1       THE COURT:  Okay.

2       MR. PASTERNAK:  Thank you again, Judge.

3       THE COURT:  All right.  Thank you.

4       MR. KLESTADT:  Thank you, Your Honor.

5       THE COURT:  Okay.

6                       - o0o -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3       I, Rochelle V. Grant, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter.

6

7   Dated:  May 4, 2017

8                              _____

9                              Signature of Approved Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25